238 So.2d 902

**Troyt TAYLOR**

**v.**

**STATE.**

**8 Div. 2.**

Court of Criminal Appeals of Alabama.

Aug. 25, 1970.

H.. Neil Taylor, Russellville, for appellant.

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

ALMON, Judge.

A jury found Troyt Taylor guilty of obtaining property by false pretense. His punishment was fixed at two years in the penitentiary.

At the conclusion of the State's case, appellant moved to exclude the evidence, rested his case, and requested the general affirmative charge.

The alleged pretense is that appellant represented to an agent of the First National Bank of Russellville that he had forty-five Jersey heifers on which he could give a good and valid mortgage.

It is contended in brief that the State failed to prove the falsity of the pretense; hence, the trial court should have given the general affirmative charge. We agree.

R. Pelham Sargent, Executive Vice President of the First National Bank of Russellville, testified that on July 20, 1961, appellant borrowed $4,863.54 from the Bank secured by a note and chattel mortgage on "forty-five Jersey heifers two years old

and increase." We excerpt from Sargent's testimony:

"Q. Mr. Sargent, after the note came due did you make any effort to try to locate the 45 Jersey Heifers, cows?

*"Defendant objects, it is illegal, irrelevant and immaterial, the only thing relative in this case is that he had 45 hiefers at the time he borrowed this money and his effort to locate them on the due date and at some future time is illegal, irrelevant and immaterial.*

*"Objection overruled.*

\*　　\*　　\*　　\*　　\*　　\*

"A. I did.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Did you find the cows?

"A. I did not.

\*　　\*　　\*　　\*　　\*　　\*

"Q. As part of your search did you try to ascertain whether Mr. Troyt Taylor had 45 Jersey heifers on July 20, 1961?

\*　　\*　　\*　　\*　　\*　　\*

"Q. Just what did you do, Mr. Sargent?

"A. Well, I went down to Troyt Taylor's community where he lived and searched around there and I was unable to find the cattle and I searched where they thought he had cattle before and they were not there.

*"Defendant objects to what he was told.*

"Witness said: Well, I was informed he had them.

*"Defendant objects, it calls for hearsay testimony.*

*"Objection sustained as to what he was told.*

"Q. Mr. Sargent, did you ever discuss this matter after July 20, 1961, with Troyt Taylor, about these cattle?

"A. I did.

Q. What did Troyt Taylor tell you about the cattle?

"A. He said he did not have them, he was going to pay us back the money, well he got put in the Penitentiary.

"Q. Did he say he never had the cows?

"A. He said he did not have a cow."

\*　　\*　　\*　　\*　　\*　　\*

"Q. Now, Mr. Sargent, do you know what Mr. Troyt Taylor's occupation was?

"A. Yes.

"Q. What was his occupation?

"A. He was a cattleman.

"Q. What kind of a cattleman?

"A. Well, at this particular time he was getting up a herd for these dairymen, he was organizing a dairy herd for these dairymen. He was organizing a dairy herd to sell to the dairymen, that's what he said.

"Q. Is that the statement he made when you loaned him the money, when you made the loan? That's what he said, he had Jersey heifers and other cows?

"A. He was making up a herd to sell to the dairymen—no, he didn't—he said he had Jersey heifers.

"Q. Have you talked to these sales people in your hunt for the cattle?

"A. Yes.

"Q. Did you find he had sold cattle at sales?

"A. He had sold cattle at sales.

"Q. He had sold cattle at sales, now did you find out what kind of cattle he sold at the sale barns?

"A. The record shows what they were, I don't know what they were.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Did you check on such a matter at Tupelo, Mississippi, at the sales barn and find he had sold cattle over there?

"A. We did.

"Q. You found he sold cattle, do you know whether he sold cattle over there at the dairybarn?

"A. No, I don't.

\*  \*  \*  \*  \*  \*

"Q. Now, Mr. Sargent, did you go down to Haleyville and look in the pasture down there where he kept some cattle?

"A. No, I did not.

"Q. Well did you have someone go down there?

"A. I did not.

"Q. You did not?

"A. No.

"Q. All right, have you informed us that he kept some cattle in a pasture in Haleyville?

"A. That's what I would say, informed.

"Q. And that was part of this investigation you are talking about, that Mr. Cleere asked you about?

"A. That's right.

"Q. You were informed that he sold cattle at Tupelo and Hester Sales Barns and had some cows in a pasture in Haleyville?

"A. I had a list where he sold at Hesters.

"Q. You had a list, but that's all part of the information you found in your investigation?

"A. That's right.

"Q. Now, did you find that he had a cattle yard at Phil Campbell?

"A. A very small one, I am sorry.

"Q. What size was it, did it have a loading ramp?

"A. I don't remember about the loading ramp, it was just what you call a corral.

"Q. Where cattle are loaded and unloaded they often need one when they haul them in large numbers?

"A. No, they didn't have a ramp.

"Q. Did it show evidence of a large number of cattle being loaded and unloaded, the grass was stomped out?

"A. That's right.

\*  \*  \*  \*  \*  \*

"Q. If you testified on a previous trial involving this note that Troyt Taylor told you that he was going to buy some cattle?

"A. I don't know whether he said buy them, he said he was getting up a herd of cattle, 1 think he already had them at the time he talked to me.

\*  \*  \*  \*  \*  \*

"Q. At the time you made the investigation he had sold some according to your investigation?

"A. Yes sir.

"Q. You don't know when he got the cattle or just when he bought them or when he sold them?

"A. No sir.

\*  \*  \*  \*  \*  \*

"Q. All right, now, Mr. Sargent, do you know of your own knowledge how many cattle Troyt Taylor had on the date he borrowed the money from you, do you know?

"A. Only his honest word, 45 head.

"Q. Now, tell it right, turn it around, *do you know of your own knowledge that he did not have the cattle on the day he borrowed the money?*

"A. Why, No!

\*  \*  \*  \*  \*  \*

760  WACHHOLZ, E.

"Q. Now, Mr. Sargent, did you make an investigation of the Cullman Stockyards?

"A. Yes sir \* \* \* no sir, I don't think so, the whole bank was working, it

might have been some of the rest I wasn't, I don't know of this investigation.

"Q. Did anybody under your direction check with the Cullman Stockyards about the sale of the cattle?

"A. Not that I know of.

\*   \*   \*   \*   \*   \*

"Q. Now, Mr. Sargent, did you make any investigation to determine where Troyt Taylor had his cattle on July 20, 1961?

"A. No."

Will Faulkner testified that he had known appellant for at least fifteen years and at one time they were in the cattle business together. He further testified as follows:

"Q. On July 20, 1961, where did you live, Mr. Faulkner?

"A. Same place, a half mile the other side of the main part of town.

"Q. And how far is that from where Troyt Taylor lived on that day:

"A. It is about a quarter possibly, it is a quarter of a mile from where I lived to where he lived.

"Q. Practically in sight?

"A. Yes sir.

"Q. Mr. Faulkner, do you know, or rather were you familiar with the property Mr. Troyt Taylor owned on July 20, 1961, his home and cattle around there?

" "A. Yes sir.

"Q. Do you know of any other property he owned?

*"Defendant objects, it is illegal, irrelevant and immaterial.*

*"Objection overruled.*

"A. No, I didn't know of any other.

"Q. Were you still buying and selling cows on July 20, 1961, Mr. Faulkner?

"A. Yes sir.

"Q. Did you see Troyt Taylor at the sales quite often?

"A. Yes sir.

"Q. Every week, would you say?

"A. Yes, ever week, at some sale or another.

"Q. Would you see him as much as twice a week?

"A. A lot of times.

"Q. I will ask you if you can tell this jury whether or not Troyt Taylor owned 45 head of Jersey cows on July 20, 1961?

"A. I didn't know, you know he never did tell me much of business, and I didn't know.

"Q. Did you know of any place he had that number of cows?

"A. No.

\*   \*   \*   \*   \*   \*

"Q. Mr. Faulkner, have you ever known of Troyt Taylor having any herd of Jersey cattle any where in that area down there around July 20, 1961?

\*   \*   \*   \*   \*   \*

"A. I didn't know of it, no sir.

\*   \*   \*   \*   \* .  \*

"Q. And you did not know of your own knowledge whether Troyt Taylor did or did [not] have 45 head of Jersey heifers on July 20, 1961?

"A. No, I didn't know.

"Q. You don't know whether he did or didn't?

"A. I didn't know, I say."

Amos DeFoor testified that he had known appellant from thirty to thirty-five years. He further testified as follows:

"Q. Along about 1961, in the summer of 1961, did you attend cattle sales in this area regular?

"A. Some, not too regular.

"Q. Did you ever attend any cattle sales with Troyt Taylor?

"A. I have.

"Q. Have you seen him at other sales when you didn't go with him?

"A. Yes, I have seen him at some sales.

"Q. Do you know of Troyt Taylor owning 45 head of Jersey heifers that had been bred on July 20, 1961, or any time around about that date?

"A. Well, I wouldn't know about it.

"Q. You don't know that he owned them?

"A. No, I don't.

"Q. Did you ever see him sell 45 head of Jersey cows two years old, or approximately that age at these sales you attended?

"A. No.

"Q. Did you ever see Troyt Taylor sell cows?

"A. Yes.

"Q. What kind of cows did you see him sell, Mr. DeFoor?

"A. Weight cattle and dairy cattle.

"Q. What sort of dairy cattle?

"A. Jerseys and Holsteins.

"Q. You didn't see him sell any Jersey cattle in quantity of 45 two years old?

"A. No.

\*    \*    \*    \*    \*    \*

"Q. Mr. DeFoor, they have asked you about on July 20, 1961, do you know of your own knowledge what he owned or what he didn't own on that date?

"A. No, I don't."

Burgess Mahan and Jimmy Weatherford, President and Cashier of the Bank, respectively, testified that sometime after July 20, 1961, they went to the home of appellant and could not find the cows in question. Both witnesses, upon being asked if they knew whether appellant had forty-five Jersey cows on July 20, 1961, answered in the negative.

The offense of false pretense consists of (1) the pretense, (2) its falsity, (3) obtaining property by reason of the pretense, (4) knowledge on the part of the accused of the falsity of the pretense, and (5) intent to defraud. Holloway v. State, 37 Ala.App. 96, 64 So.2d 115.

If the offense was committed at all, it was at the time the loan was obtained, viz., July 20, 1961. Carlisle v. State, 77 Ala. 71; Edwards v. State, 45 Ala.App. 136, 227 So.2d 134.

It was, therefore, incumbent on the State to prove to the required degree that appellant's statement to the banker that he had forty-five Jersey heifers on July 20, 1961, was false.

The State's evidence at best tended to show that the Bank employees could not locate the cows at some time subsequent to the date of the loan. Further, that appellant had sold an undetermined number of cows during the time between the date of the loan and that of the Bank employees' investigation. The other witnesses testified that they had not seen appellant with forty-five cows but they could not testify that he did not in fact have them. We do not believe this is sufficient evidence upon which to predicate a conviction.

The scintilla rule does not apply in criminal cases. There must be substantial evidence tending to prove all the elements of the charge. Ex parte Grimmett, 228 Ala. 1, 152 So. 263.

When the evidence in a criminal case raises a mere suspicion, or if the defendant's guilt is uncertain or dependent upon conjecture or probability, the trial court should grant a motion to exclude or give the requested general affirmative charge; for such evidence does not overcome the presumption of innocence with which every accused is clothed.

Reversed and remanded.