320 So.2d 747

**Ruby Lee LATHAM**

v.

**STATE.**

**3 Div. 304.**

Court of Criminal Appeals of Alabama.

Feb. 18, 1975.

Rehearings Denied April 1, 1975.

James M. Fullan, Jr., Birmingham, J. Paul Lowery, Montgomery, William D. Latham, Clanton, for appellant.

William J. Baxley, Atty. Gen. and William G. McKnight, Asst. Atty. Gen., for the State.

CLARK, Supernumerary Circuit Judge.

A jury returned a general verdict finding appellant guilty as charged in a two-count indictment, the first count charging her with obtaining by false pretense "from the State of Alabama a sum of, to-wit: $489.90," the second count charging her with larceny of the same sum, "the personal property of the State of Alabama." She was sentenced to ten years imprisonment in the penitentiary, the maximum punishment for each of the two crimes. Title 14, Sections 209 and 331, Code of Alabama. The counts of the indictment followed substantially the applicable forms prescribed by Title 15, Section 259, Code of Alabama (Form 60 as to obtaining money or other personal property by false pretense and Form 66 as to grand larceny). Each count of the indictment also charged one Robert O. Wilson with the same offense, but each defendant demanded a severance, which was ordered, and appellant after pleading not guilty was "tried separately, alone and apart from" the other defendant.

The paramount issue on the trial was the truth or falsity of some details expressed in the first count of the indictment to the effect that defendant did falsely pretend to the State Comptroller, or his duly authorized agent, with intent to defraud, that one J. F. Ragland had ordered or requisitioned for the State of Alabama, Highway Department, designated parts, machinery or supplies of the aggregate value of "$499.90," that said property had been shipped or delivered to said Highway Department by Machinery and Supplies, Inc., a corporation, and that payment was due and owing thereon. The property involved was further described as "3 Tailwheel Assemblies, Stock No. 6320" and "5 Front Half 35R Universal Assemblies, Stock No. 377."

After being identified by a witness from the Highway Department Bureau of Equipment, a field requisition for supplies dated December 28, 1972, purportedly signed by "J. F. Ragland," otherwise identified as James F. Ragland, also employed by said Bureau, was admitted in evidence. James F. Ragland testified that he did not sign the requisition, that the signature thereon was not his, and that he did not authorize anyone to sign it for him. The requisition was for 3 Tailwheel Assemblies and 5 Front Half Universal Assemblies as described in the first count of the indictment and called for their delivery at a total price of "$499.90," to J. F. Ragland,

and was addressed to R. O. Wilson, otherwise identified as Robert O. Wilson, the other defendant charged in the indictment, at the time acting equipment maintenance director of the Highway Department Equipment Bureau. Mr. Ragland testified that he never received the particular items; that he had pulled every piece of paper in his office and had been unable to find any record of the items involved. He also testified that about ninety percent of the parts received in his warehouse are not given inventory numbers because their value is not great enough. He further testified that he knew Mr. Wilson, and that Mr. Wilson gave the instructions on how to handle the parts that came to the warehouse. Mr. Ragland had six or seven men under him, and he did not see every part which came into the warehouse. Mr. Ragland's testimony proved to be inapplicable to his duties at the time of the particular transaction involved, for on cross-examination he testified that he had been replaced for several months prior to December 28, 1972, in the work as to which he testified.

There was also introduced in evidence by the State an order dated December 29, 1972, (Local Delivery Order No. 97488) on a form of the Equipment Bureau, directed to Machinery & Supplies, Inc., for the identical items (and prices) listed in the material requisition. It called for delivery of the items to "Mr. R. O. Wilson," was purportedly certified by R. O. Wilson as ordered on submitted forms and was also purportedly certified by him as "needed for official Highway Department work as authorized by me." This Local Delivery Order contains a receipt for the listed items which was purportedly signed by "H. G. Sexton." The order contains the signature of R. O. Wilson under the printed legend "Approved for Payment."

Mr. Homer Sexton testified that he is employed by the State Highway Department Equipment Bureau. He identified himself as the person whose name was signed to the receipt portion of Local Delivery Order No. 97488, but stated that it was not his signature and he did not authorize anyone to sign for him. His records did not show that the equipment had been received, but he was unable to state whether the equipment had been received. Next to his name are handwritten marks that he identified as the initials "M.M.," which he related to the typist for the department by the name of Martha Morgan.

Martha Morgan testified that at the time of the issuance of Local Delivery Order No. 97488 Mr. Robert Wilson was her supervisor. It was her practice to type "L. D.O.'s" (local delivery orders) from handwritten field requisitions. She signed Mr. Sexton's name to the particular L.D.O. She also signed Mr. Wilson's name to two certifications as partly quoted hereinabove. The field requisition form was filled in in handwriting, which the witness testified was that of Mr. Wilson and that the field requisition was given her by Mr. Wilson. Mr. Sexton had never authorized her to sign his name on any L.D.O. The witness further testified that she was introduced to appellant-defendant in Mr. Wilson's office; that she visited there frequently and that often, after such visits, the three of them would go for coffee. According to her testimony, after such visits by appellant-defendant, the witness usually had some invoices from which she typed L.D.O.'s. She said that appellant did not ask her to type the L.D.O.'s, that she was asked to do so by Mr. Wilson, but that appellant-defendant did sometimes wait for her to type them. In referring to her affixing the names of Mr. Wilson and Mr. Sexton to the documents, she said that one James White had told her that that was the way to do it.

Mr. William Norris, an employee of the State Comptroller's office, whose immediate supervisor is the State Comptroller, testified that he is the custodian of the records of that department. He identified State's Exhibit 2, which contained: 1. a State Highway Department Voucher No. 26013; 2. a copy of L.D.O. No. 97488;

3. an invoice from Material and Supplies, Inc., No. 1403, which items were admitted in evidence. There were seven transactions on the voucher, which were paid for by State Warrant No. 90463, on January 18, 1973, in the amount of $2,546.93. The L.D.O. and the M&S invoice called for payment of $499.90 with a two percent discount, making the sum due $489.90, which constituted one of the seven items on the voucher which was approved for payment on January 16, 1973. The witness stated that he audited this particular transaction from the standpoint of correctness of figures and signatures supporting the material receipts, that he approved it for payment and that he based his approval on the fact that the parts on the invoice and the parts on the L.D.O. were the same and the L.D.O. had a signature at every available place showing the parts were received. He said that State's Exhibit 2 was the cause of the issuance of the warrant. He said that at the time of his approval he had not noted anything irregular about the transaction, that there was no signature of defendant on any of the papers, and that he did not know whether the materials were delivered.

The warrant for the sum of $2,546.93 payable to Machinery & Supplies, Inc., was introduced in evidence by the State upon its identification by Verna H. Gray, an employee of the State Treasurer's Office, Supervisor of the Warrant Division. It was endorsed "For Deposit Only to the Account of Machinery and Supplies, Inc., Ruby Lee Latham, Secretary and Treasurer."

Edwin Dow, an official of the Union Bank and Trust Company in Montgomery testified as to an account at the bank in the name of Machinery and Supplies Company. He identified a deposit slip of the Union Bank & Trust Company showing a deposit of $2,546.93, which he correlated with State Warrant No. 94063. The deposit slip was dated January 19, 1973. The witness also identified copy of a check drawn on the account of Materials & Supplies, which check was signed by appellant-defendant and dated January 19, 1973, and testified that for said check a bank money order was issued in the same amount. These and other items were introduced in evidence.

A vice president of the Citizens Bank & Trust Company of Selma, Alabama, testified as to a checking account statement for the month of January 1973 of defendant Ruby Latham. He identified an exhibit introduced in evidence as a copy of a deposit ticket for her on her account in the amount of $2,100 and a copy of the bank money order issued by the Union Bank & Trust Company to Ruby Latham in the same amount, as testified by Mr. Dow. He further testified as to several withdrawals by defendant Ruby Latham as represented by cancelled checks in favor of various payees, some of which were payable to Machinery and Supplies.

Bryce Richbourg, an employee of the State of Alabama Examiners of Public Accounts Office, testified that in September-November 1973 he examined and audited purported purchases by the Highway Department from M&S, including those covered by State Warrant No. 90463 and Voucher No. 26013, including particularly equipment covered by L.D.O. No. 97488. He testified at length and upon profuse questioning by both counsel for the State and counsel for defendant as to the extent and accuracy of his investigation and audit. He testified that he did not find property or supporting documents to show possession by the purchaser of the property described in many of the documents purporting to represent purchases by the State Highway Department from Machinery & Supplies, including those listed in L.D.O. No. 97488. He discovered approximately two hundred transactions between the State Highway Department and Machinery and Supplies Company which were under $500.00, as to which he never found any of the property covered or supporting documents to show that the property involved

in such transactions was ever in the possession of the Highway Department; his audit covered a period from July 19, 1971, to August 1973; throughout the investigation L.D.O.'s were discovered which were soundly documented, but there was a net charge back of $92,842. He testified that at no time did he ever find the signature of defendant Latham on any of the papers and that he was aware that Mrs. Martha Morgan had signed a number of the papers by signing the person's name with her initials under it. The total amount of the transactions between the State of Alabama and Machinery and Supplies Company was afterwards shown on cross-examination of a defendant's witness as totaling $179,695.06.

An attorney for Machinery and Supplies, Inc., testified on the call of defendant that he incorporated Machinery and Supplies Company and related corporations of one Robert P. Stapp. The incorporators of Machinery and Supplies, Inc., were Stapp, the defendant and a secretary in the attorney's office; all of the stock was afterwards transferred to Mr. Stapp; since the death of Mr. Stapp (in September 1972 according to another witness) the attorney had dealt with Ruby Latham as secretary of the corporation; she was the sole remaining officer and sole remaining director of the corporation. He said that as far as he knew as an attorney, Robert P. Stapp or his estate was the owner of Machinery and Supplies Company.

Edna Harris, a witness for the defense, testified that she had been a nurse (sitter) for Mr. Stapp for almost a year before his death in September 1972, that thereafter she commenced working for Machinery and Supplies Company and that her duties included checking parts as they would come in, that from time to time State of Alabama trucks would come to Machinery and Supplies and pick up parts and that on occasions she mailed L.D.O.'s to the State; that she did banking for Machinery and Supplies and the defendant, that she would take State warrants to the Union Bank and get money orders and on occasion would bring cash back and that the L.D.O.'s came to her through the mail. She testified that she had seen Robert Wilson at the office of Machinery and Supply Company and that she had seen another named employee of the State Highway Department come to the office of Machinery and Supplies and pick up merchandise.

Robert W. Pickett, Jr., was called as a witness for defendant. He is chief accountant for the Highway Department. He testified that he made an audit of "all the L.D.O.'s in question," checking with the mechanics that were assigned to the shop and determined that the parts were not installed on their pieces of equipment. He also determined that two truck loads of parts were brought from Machinery and Supplies Company to the Highway Department warehouse in Montgomery and that the parts were inventoried. In the course of his audit Mr. Pickett discovered that there were parts on hand in various divisions that were not explainable, that is, that were not on any inventories and not justified by L.D.O.'s. On cross-examination he stated that the parts be discovered in his audit were not charged back in the L.D.O.'s and that some of the parts he discovered were obsolete.

W. G. Thomas, a witness for defendant, testified that he was employed by the State Highway Department and participated in the inventory conducted by Mr. Pickett. According to him, seventy-two percent of the items inventoried were usable by the State of Alabama and fifty-two percent were usable on the second shipment. On cross-examination he stated that he was not present when the first load of parts came in, but was present when the second load came in and that many of them were obsolete.

John Madison Cauldwell, a witness for the defense, Fiscal Supervisor for the State Highway Department, testified that he made an investigation on behalf of the Highway Director and determined that

there were parts on hand which were not inventoried. A list of these parts was prepared and a value of $33,277.07 was given to them.

Witnesses were called who testified as to defendant's good character.

Thereafter the State recalled the witness, John Cauldwell, for further cross-, examination. He testified as follows:

"Q. In your judgment, the amount of parts received by the State of Alabama is not anywhere near a hundred and seventy-nine thousand dollars, is it?

"A. Well, this would be a fact. You would have to reduce the hundred and seventy-nine thousand dollars by the amount of this claim. There is no question about that.

"Q. And that is some ninety-four thousand?

"A. Ninety-four thousand, in round figures.

"Q. In other words, what you are saying is, that amount, you know, they did not receive parts for?

"A. I know that they did not receive those parts as set out on the LDO's and I know those parts were not used on equipment as listed on the LDO's."

Neither appellant nor codefendant Wilson testified in the case.

In her brief and in oral argument of her counsel, appellant bases her request for a reversal chiefly upon the following contentions:

1. That the trial court committed error in submitting the larceny count (Count Two) to the jury.

2. That Count One (the obtaining by false pretense count) was erroneously submitted to the jury.

3. That the trial court erred in admitting in evidence testimony as to a statement by co-defendant Wilson.

We consider the contentions in the order they are presented in appellant's brief.

There seems to be no disagreement between the parties as to appellant's proposition that she is entitled to a reversal if the evidence was insufficient as to either count of the indictment. As above indicated, the verdict was general, not limited to one of the counts. The general affirmative charge was requested and refused as to each count. The principle relied upon by appellant in this respect is well established. *Jones v. State*, 236 Ala. 30, 182 So. 404; *Hawes v. State*, 216 Ala. 151, 112 So. 761; *Stover v. State*, 36 Ala.App. 696, 63 So.2d 386; *Jackson v. State,* 33 Ala.App. 42, 31 So.2d 514, cert. denied 249 Ala. 348, 31 So.2d 519.

In determining whether there was any evidence to support the allegations of larceny as charged in Count Two of the complaint, it is not for us to say whether there is evidence to support some offense that is or should be punishable as if it were larceny. We must determine whether there is evidence to support all of the essential elements of larceny itself.

The parties are in basic agreement as to the definition of larceny and rely upon the same authority, *Livingston v. State*, 44 Ala.App. 559, 216 So.2d 731, wherein larceny is defined as ". . . the (1) felonious taking and (2) carrying away of (3) personalty of (4) another (5) with intent to (a) convert it or (b) deprive the owner thereof."

Apparently recognizing that the evidence as to the conduct of defendant relative to the particular averment of Count Two of the indictment that she "took and carried away" described property of the State of Alabama does not come within the usual pattern of larceny cases, the State relies upon the principle established at common law and in Alabama to the effect that at times there can be larceny by trick and argues that when the fine line of distinction between larceny by trick and obtaining money or property by false pretense is ap-

plied to the evidence herein, a conviction of larceny is shown to be justified.

The State relies particularly upon *Anderson v. State*, 33 Ala.App. 531, 36 So.2d 242, cert. denied 251 Ala. 32, 36 So.2d 244, in which the evidence showed that defendant received a sum of money for the sale of an automobile. He did not deliver the automobile to the buyer and appropriated the money to his own use. It was there held that if he entertained a fraudulent purpose of appropriating the money to his own use he would be guilty of larceny, that "where one gains possession of the money so as to constitute only a bare charge, or custody, or procures it by subterfuge, it does not divest the possession of the true owner who is still in the constructive possession, and the offense of appropriating the money is larceny." The opinion in the case makes it clear that unless the party injured surrendered "the possession of the money only and not the title thereto" the crime of larceny was not committed.

■ The rationale of cases to the effect that one can be guilty of larceny by trick, as distinguished from obtaining money or property by trick or false pretense, is that, at times, but not always, when he thus obtains it, the purported assent of the one injured is treated as a nullity and the taking of the money or property is treated as if no consent thereto had been given, but even in such cases it is clear that larceny is not committed unless the party injured parts with the property with the intent to part with possession only and not with title. *Reynolds v. State*, 31 Ala.App. 259, 15 So.2d 600, cert. denied with opinion 245 Ala. 47, 15 So.2d 605; *Powers v. State*, 31 Ala.App. 614, 21 So.2d 282, cert. denied, 246 Ala. 506, 21 So.2d 286; *Blanton v. State*, 36 Ala.App. 183, 53 So.2d 810; *Hufstetler v. State*, 37 Ala.App. 71, 63 So.2d 730. In *Hufstetler*, just cited, the court quotes with approval from 35 C.J.S. False Pretenses § 3, p. 638, as follows:

"The crime of obtaining money or goods by false pretenses is closely allied, or analogous, to that of larceny, and it has been said that the statutes denouncing it and like offenses were designed for the fuller protection of personal property and in aid of the laws against larceny and theft. However, the two offenses are generally distinguishable, although the distinction is very fine where the obtaining of the money or property is accomplished by fraud, trick, or device. The distinction between the crimes of obtaining by false pretenses and larceny lies in the intention with which the owner parts with the property; if the owner, in parting with the property, intends to invest accused with the title as well as the possession, the latter has committed the crime of *obtaining* the property by false pretenses, but if the intention of the owner is to invest accused with the mere possession of the property, and the latter, with the requisite intent, receives it and converts it to his own use, the crime is larceny."

In *Reynolds, supra*, it was stated by the Court of Appeals:

"But of course it must always be kept in mind that there is a clear distinction between obtaining merely the *possession*, and obtaining *both* the possession and the title. In this *latter* case, the culprit could not be guilty of larceny. *Murchison v. State*, 30 Ala.App. 15, 199 So. 897. But in the former he *could*—and would. *Savage v. State*, 15 Ala.App. 168, 72 So. 694."

■ In the cases listed, including *Anderson, Blanton* and *Murchison,* in which it was held that in the particular case larceny could have been committed as distinguished from obtaining money or property by false pretense, there were circumstances which either showed or tended to show that there was a parting with possession for a specific and limited purpose. In this case, whenever and wherever the money involved was parted with by the State, it cannot be said that it was parted with for a specific or limited purpose or that the State, or

anyone acting for the State, intended to part with the possession only.

■ For an additional reason, whether considered standing alone or in connection with the reason just discussed, we think there was no evidence to support the charge of larceny. Larceny necessarily involves a trespass to personal property, whatever the form of the personal property, whether money, tangible property or intangibles such as checks, notes, promissory notes, etc. It must possess characteristics that enable it to be "taken and carried away." Although it may be representative of property of a more substantial nature, it must possess some body of its own. In *Milam v. State*, 240 Ala. 314, 198 So. 863, it is stated:

"We may remark as to the proof of larceny, under our decisions and statutes, that such offense is based on the fact that it is a civil trespass on the possession of another as to his personal property done with a felonious intent. Larceny has been defined by this court in *Edmonds v. State*, 70 Ala. 8, 45 Am.Rep. 67, as follows: 'The usual definition of "larceny" is, "the felonious *taking* and *carrying away* of the personal goods of another." 4 Black.Com. 229. It is defined in Roscoe's Criminal Evidence, as "the wrongful *taking possession* of the goods of another, with intent to deprive the owner of his property in them."—Ib. 622. It is a well-settled rule, liable to some few exceptions, perhaps, that every larceny necessarily involves a *trespass,* and that there can be no trespass, unless there is an actual or constructive taking of possession; and this possession must be entire and absolute.—Roscoe's Cr.Ev. 623–24; 3 Greenl.Ev. § 154. There must not only be. such a caption as to constitute possession of, or dominion over the property, for an appreciable moment of time, but also an *asportation,* or *carrying away,* which may be accomplished by any removal of the property or goods from their original status, such as would constitute a complete severance from the possession of the owner. 1 Greenl.Ev. § 154; Roscoe's Cr.Ev. p. 625. * * *'"

■ The money that defendant allegedly took and carried away was neither specie nor currency. Nor did it possess physical substance capable of being actually seized, possessed or moved.

Although the common law concept of larceny has been expanded by statute and judicial decisions of some states, we are of the view that as applicable to the facts in this case the rule we should follow is stated in 52A C.J.S. *Larceny,* § 2c, as follows:

"Generally, only property which is tangible and capable of being possessed may be the subject of larceny. The thing of which the owner is deprived must have corporeal existence, that is, be something the physical presence, quantity, or quality of which is detectable or measurable by the senses or by some mechanical contrivance, since a naked right existing merely in contemplation of law, although it may be very valuable to the person who is entitled to exercise it, is not a subject of larceny."

We do not overlook the well recognized principle, by statute in most states and in Alabama, that property classified often as intangible can be the subject of larceny. In accordance with statutory authority as now found in Title 1, Section 2, Code of Alabama that "The term 'personal property' includes money, goods, chattels, things in action and evidence of debt, deeds, and conveyances.", most or all of such items have been held to be the subject of larceny. *Corbett v. State,* 31 Ala. 329 (bank bills); *Shannon v. Sims,* 146 Ala. 673, 40 So. 574 (mortgages); *Johnson v. State,* 159 Ala. 113, 48 So. 792 (clearing house certificates). In accordance therewith, we have no doubt that the warrant involved in this case issued by the State of Alabama constitutes property that is the subject of larceny, *but the evidence does not show*

*and the indictment does not charge that such warrant was "taken and carried away" by defendant.* However defendant may have enriched herself unjustly or illegally, *she did not do so by taking and carrying away "to-wit: $489.90, of the value, of, to-wit: $489.90 in lawful currency and coinage of the United States of America."*

No larceny—no trespass—is charged in the first count of the indictment. The applicable statutory law consists of a departure in the field of criminal law from hard and fast procedural principles of early common law as to trespass, as was done in the field of civil procedure by the Statute of Westminster II, in its provision for civil actions in "similar cases," that is, cases sufficiently "similar" to trespass actions to justify legal relief, even though they did not meet the inflexible requirements of trespass actions. The distinction between the two kinds of actions becomes relatively unimportant in civil proceedings by reason of the adoption of the Alabama Rules of Civil Procedure. In criminal law, however, the mentioned principles as to trespass survive, and we have no authority for a retrospective transition that produces the result accomplished in the field of civil procedure after proper notice, long study, and due process.

"The crime of obtaining property by false pretenses was unknown in the early common law." 35 C.J.S. *False Pretenses* § 2. By the same authority and Section 4 thereof, we are informed that against a background of the loosely defined crime of "cheating," the offense of obtaining property by false pretenses was ultimately the product of several English statutes, including that of 30 George II and 33 Henry VIII. . The conduct involved and required does not necessitate the exertion of any physical force, actual or constructive. The actual conduct of the wrong is that of obtaining property by falsely pretending, while that of larceny consists of the taking and carrying away of property. The intent is generally the same as to both crimes, but the method of committing larceny is limited to such a method as would constitute a trespass. There is no such limitation on the method of committing the crime of obtaining property by false pretenses, which can well be by either word or deed.

Applying these distinctions and principles, we arrive at the conclusion that for money to be the subject of larceny, the money must be of such nature or composition that it can be actually taken and carried away but that obtaining money by false pretense can be accomplished as to money that cannot be so characterized. The reason for the difference is not to be found so much in a distinction between kinds of money, as in the differentiation between the verbs of the definition of larceny and the verb of the false pretense crime.

In *Mason v. State,* 23 Okl.Cr. 111, 212 P. 1028, appellant contended that there was a fatal variance between the proof offered and the allegations of an information, in that the proof showed that the property received by defendant was a city warrant, deposited in the bank to the credit of the defendant, and that the information charged defendant with obtaining money, "that credit in a bank, through the medium of a city warrant, is not 'money' within the meaning of the statute or the averments in the information." The court held:

"We recognize that the rules of construction as above announced and applied have not been everywhere followed in all cases; but, considering the purpose of this particular statute, express and implied, we are impelled to hold, upon sound reason and respectable authority, that the word 'money' in this instance should be construed in a generic sense, so as to include coin, currency, drafts, warrants, and other things equivalent to money by means of which the person injured was deprived of money. We think

it would be an outrageous injustice to the taxpayers of the city of Ardmore to hold otherwise on the flimsy pretext that the defendant obtained credit, but, strictly speaking, no money, at the time the warrant was deposited to defendant's credit. By this false pretense the taxpayers lost this money or its equivalent, and that is sufficient."

In a brief opinion in *Pirkle v. State,* 24 Ala.App. 19, 129 So. 707, it was held that obtaining money by false pretense could be shown by the obtaining of a "deposit slip" from a bank, upon which account a check was issued in favor of a creditor of defendant, which check was honored by the bank. The representation or pretense was made to the bank.

*Pirkle, supra,* afterwards became beclouded upon consideration of a previous opinion of the Court of Appeals, in *Hendrix v. State,* 17 Ala.App. 116, 82 So. 564, written by then Judge Joel B. Brown, afterwards Mr. Justice Brown of the Supreme Court, which held that an indictment charging that accused by false pretenses obtained $500 is not sustained by proof that he secured a check for $500. Neither *Pirkle* nor *Hendrix* went to the Supreme Court, but the state of the law on the subject as affected by *Pirkle* and *Hendrix, supra,* as well as by *Pollock v. State,* 210 Ala. 69, 97 So. 240 and *O'Brien v. State,* 238 Ala. 189, 191 So. 391, was considered by the Supreme Court, speaking through Chief Justice Gardner, in *Simmons v. State,* 242 Ala. 105, 4 So.2d 905, in denying certiorari in 30 Ala.App. 211, 4 So.2d 903, wherein Judge James Rice wrote the opinion in accord with the opinion he had written in *Pirkle, supra.* In *Simmons,* defendant was charged with obtaining money from a bank by false pretense in procuring a loan of the sum of $500, for which the bank issued a deposit slip and placed that sum to his credit in the bank. The evidence further showed that defendant issued a check for that amount the following day, which check

was paid. On certiorari the Supreme Court stated:

"Indeed in *City National Bank v. Burns,* 68 Ala. 267, 44 Am.Rep. 138, the holding was that the act of the bank in crediting a depositor with the amount of a check drawn upon it by another customer, is 'equivalent to a payment in money'.

"It would be carrying technicality to a most regrettable extreme to hold that the proof of the mere instrumentality of obtaining the money constitutes a variance with the charge of obtaining the money itself, when the same evidence discloses the fact that the money was so obtained. Counsel for defendant lays stress upon two decisions of this Court. *Pollock v. State,* 210 Ala. 69, 97 So. 240 and *O'Brien v. State,* 238 Ala. 189, 191 So. 391.

"In the *Pollock* case the money was obtained upon a promissory note, which may be said to present a matter of difference. But even in that case the Court was sharply divided, the writer with Mr. Justice Somerville concurring in the dissenting opinion of Mr. Justice Thomas. Perhaps the *O'Brien* case is more nearly analogous, as it concerned the issuance of a check as the instrumentality through which the money was obtained.

"Mr. Justice Thomas and the writer acquiesced in the *O'Brien* case upon the theory the matter had been set at rest by the previous decisions of the Court. As for the writer he has lived to regret the acquiescence, as, to his mind, there was presented a good opportunity for the Court to step in line with the weight of authority and more in accord with plain common sense.

"But here we are dealing with a deposit slip and the cases relied upon dealt with no such instrumentality. There is no occasion, for a definite announcement, therefore, as to either the *Pollock* or *O'Brien* cases.

"Courts are established for practical purposes and should function with a practical end in view. One of the outstanding values of a bank is the matter of safety to the depositor of his money, and, of course, the 'deposit slip' but evidences the fact, for all practical purposes, that the depositor has so much funds in the bank subject to immediate use.

"It was, in the instant case, merely the instrumentality through which the defendant received his money, and to hold a fatal variance in such a case would run counter to common sense and tend to frustrate the practical end, for the accomplishment of which courts were established."

There was concurrence by all of the other justices sitting in the case other than Justice Brown, who dissented on authority of *"Hendrix v. State, . . .* and cases therein cited."

█ In support of appellant's contention that she was entitled to the general affirmative charge in her favor as to the false pretense count, her counsel insists that there was no substantial evidence to substantiate the charge of falsity of the representation allegedly made by appellant. Heavy reliance is placed on *Taylor v. State,* 46 Ala.App. 105, 238 So.2d 902. In an attempt via a "paraphrase" to apply what was held in that case to the facts of this case, counsel for appellant states:

"The State's evidence at best tended to show that employees of the State of Alabama could not locate the property at some time subsequent to the date of January 16, 1973. Further, that the State of Alabama in the course of searching for the property discovered numerous items of property which were not reflected on the records of the State of Alabama. We do not believe that this is sufficient evidence upon which to predicate a conviction."

We do not agree with the first sentence of the quoted statement, upon which the conclusion in the last sentence is primarily based. In the instant case there was much more than evidence to the effect that employees of the State could not locate the property subsequent to the time of the alleged criminal conduct. There was positive evidence from one whose name was signed to the requisition for the property involved that he did not receive it. There was positive testimony by the one whose name was signed to the receipt for the equipment that he did not sign such receipt and that his records did not show that the equipment had been received. He further testified that the parts listed in the particular local delivery order involved were not received by him and that he had never seen them to his knowledge. Although it may be correctly stated that it was not conclusively proved that the specific representation that the specific property had been received by the State Highway Department was false, the specific order that makes that representation was unquestionably false in significant respects. The representation therein that R. O. Wilson certified by his signature that the items listed therein were ordered on a basis of forms submitted was false; that R. O. Wilson certified by signature that the items listed thereon were needed for official Highway Department work as authorized by him was false and that the representation that H. G. Sexton had certified thereon that the items listed therein were received by him was false. In this connection it should be stated that the scribbling just beneath the line upon which the names of R. O. Wilson and H. G. Sexton, which was identified by the witness Martha Morgan as her initials, cannot be identified without the benefit of her testimony or some other information that does not appear on the document, as decipherable initials of anyone or as purporting to constitute a clear representation that the purported signatures are not genuine. The purported signatures are written, rather than printed, in ink. The word

"by" is not there. The circumstances are sufficient, we think to constitute evidence, whether conclusive or not, that R. O. Wilson knew of the irregularities of documents, which irregularities can be characterized as falsities, and which irregularities were not noted and were hardly noticable on the face of the documents by the employee of the State Comptroller's office who approved the voucher for payment and authorized the issuance of the State Warrant. The purposeful falsities of the representations of the requisition for supplies and of local delivery order No. 97488 are traceable to Mr. Wilson and constitute vivid earmarks of knowledgeable falsity on his part of the representation that he had received the items of equipment involved. The circumstances shown as to the activity of appellant, her visits to the office of Mr. Wilson, her usual action of presenting invoices for the issuance of local delivery orders, her complete control of the business of Machinery and Supplies at the time of the particular transaction and her personal thereof, furnish ample substantial support by her personal withdrawal of a large part thereof, furnish ample substantial support for a finding by a jury that she participated in a scheme that defrauded the State of Alabama by a false representation as alleged in the first count of the indictment.

It is insisted by appellant that the trial court erred in permitting the witness J. M. Cauldwell to testify that Robert Wilson codefendant in the indictment, but severed on the trial, told him that he took his orders from Gerald Wallace and Richard Stone. This testimony was given on cross-examination of the witness, who had testified as a witness for defendant. Appellant argues that at the time of the statement, several months after the time of the alleged crime, any conspiracy between the defendants had ceased and that the question of the admissibility of the statement is governed by the principle that where it is shown that a conspiracy continues to exist, the acts or declarations of one conspirator are admissible against the other when made in further-

ance of the common design, but the acts or declarations are not admissible if it is shown that when they were made the conspiracy ceased to exist. *Edwards v. State,* 279 Ala. 371, 185 So.2d 393; *West v. State,* 168 Ala. 1, 53 So. 277. Appellee limits its contention on the question to reliance upon what may be considered either an exception or a qualification of the rule just stated, namely, that the efforts of one conspirator to destroy evidence or suppress testimony as to a crime are admissible against each participant. *Dailey v. State,* 233 Ala. 384, 171 So. 729; *Lancaster v. State,* 214 Ala. 2, 106 So. 617; *Poellnitz v. State,* 48 Ala.App. 196, 263 So.2d 181.

The State sought to relate the statement to a conversation between the witness and appellant wherein he asked her to give him any information that she could give to help him complete the investigation he was making at the time and that she did not give him any information; that at that time he told her that "it looked like she and Wilson were going to be in trouble" and that she replied "Oh, no. They won't let Robert down."

The issue between the parties on the matter is narrowed to whether the particular testimony is covered by the rule stated in *Dailey, supra,* as follows:

"But it is a further rule, generally recognized, that where there appears a continuing conspiracy to destroy the evidence of the crime, suppress testimony, the efforts of one in the accomplishment of this common purpose are admissible against each."

The principle is splendidly summarized by Judge McElroy in *The Law of Evidence in Alabama,* (2d ed.) § 195.03(5):

"If the evidence warants a finding of accused's participation in a conspiracy to suppress or fabricate evidence of the crime after its commission, an act or statement of a coconspirator in the accomplishment of this continuing conspiracy, is admissible against the accused."

The particular ruling complained of was made after a colloquy in the presence of the jury among the court, counsel for the State and counsel for defendant, interspersed with the admitted testimony as to statements of the witness to defendant and her statement to him, as partly narrated above. As to some of such testimony, defendant objected on the trial, but that point is not raised on this appeal. Furthermore, the record indicates that the same evidence as to the conversation between the witness and appellant was otherwise introduced without any objection by defendant. When the question was asked calling for the testimony now under consideration, counsel for defendant objected and stated as grounds, "It calls for hearsay conversation," to which counsel for the State replied "He is a co-Defendant. He is indicted. It was part of a scheme." The court then overruled the objection and counsel for the State asked the witness to "Go ahead." After he answered, counsel for defendant moved to exclude "the witness' answer relative to conversations with the Defendant and with any other persons, including Wilson.", and moved for a mistrial, assigning grounds as to each motion, "that defendant was not advised of her constitutional rights . . . nor was the testimony shown that Mr. Wilson was so advised of his rights; that Mr. Wilson's conversation with this man would be hearsay. This is not a conspiracy trial, Your Honor. This is a trial for larceny and false pretense." The court overruled the objection and denied the motion for a mistrial.

■ Although the respective contentions of the parties are in focus with us, we are not fully enlightened by either party as to the applicability of its or her contention to particular features of the great mass of testimony in the case. Also, we do not feel that their contentions are in the same focus with us as they were with the trial judge, either as to their applicability, or as to the basis shown on the part of the State for the contention that the statement was admissible, or on the part of the defendant for her contention to the contrary. As to the contentions now made, if the statement was not made by one acting in concert with appellant to suppress testimony, it was not admissible; on the other hand, if the two defendants were acting in concert to suppress testimony and the statement was made in furtherance of their efforts to do so, it was admissible whether the trial was a "conspiracy trial" or not. We do not find substantial evidence in the case to justify a conclusion by us that at the time of the statement the defendants were acting in concert to suppress testimony. It is our view that the statement should not have been admitted in evidence. It is to be noted that at the close of the evidence the State asked that it be allowed to reopen the case to show that the statements of the defendants were actually made "during the transactions and furtherance of the actual transactions which we have alleged constituted the conspiracy," which request was denied. It is not for us to say whether the statement in question can be so buttressed by evidence as to be made admissible.

■ Appellant argues that the judgment below should be reversed and one here rendered discharging defendant. If appellant is correct in her claim that there is not sufficient evidence to present a jury question as to the guilt of defendant as to either count, the first or the second count, and that it appears that the State could not at another trial present such evidence, there is logic in the request for a judgment of reversal and rendition.

In view of our conclusion that the judgment of the trial court should be reversed by reason of the error of the court in refusing defendant's requested general charge as to the larceny count of the indictment, our treatment of other questions may seem unnecessary, but such action has seemed to us appropriate in the interest of a final proper disposition of this case. Thereby the matter can be fully reviewed by the Supreme Court at the instance of the State and at the instance of appellant, to the end that a judgment be rendered af-

firming the judgment of the trial court, as urged by the State, or a judgment rendered reversing that of the trial court and discharging appellant, as urged by appellant, if the Supreme Court determines that the one or the other of such judgments is appropriate. At any rate, it seems desirable, if this case is to be tried again, for the trial judge and parties and their attorneys to have the benefit of a final disposition of all questions raised on this appeal and which will likely be raised again on another trial. With this in mind we have gone beyond a determination that defendant was entitled to the general charge in her favor as to the count of the indictment charging larceny.

For the errors stated, the judgment is reversed and the case is remanded for a new trial.

The foregoing opinion was prepared by Honorable Leigh M. Clark, Supernumerary Circuit Judge, serving as Judge of this Court under Section 2 of Act No. 288, Acts of Alabama, July 7, 1945, as amended; his opinion is hereby adopted as that of the court.

The judgment below is hereby

Reversed and remanded.

CATES, P. J., and TYSON, HARRIS and DeCARLO, JJ., concur.