383 So.2d 547 (1979)
Ronald WILLIAMS
v.
STATE.
3 Div. 772.
Court of Criminal Appeals of Alabama.
May 22, 1979.
Rehearing Denied June 26, 1979.
*550 Julian L. McPhillips, Jr. and T. Thomas Gallion, III, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen. and John A. Yung, IV, Asst. Atty. Gen., for the State.
BOWEN, Judge.
The defendant was indicted jointly with Alabama State Representative Thomas J. Reed by the Montgomery County Grand Jury for the offense of bribery of a state legislator as provided for in Title 14, Section 73, Code of Alabama 1940, now Ala. Code Section 13-5-31 (1975). The indictment returned against this defendant is identical to the one set forth in Reed v. State, Ala.Cr.App., 372 So.2d 872 (1978). Representative Reed was convicted of an attempt to commit the charged offense and fined $500.00. This defendant was found "guilty as charged" and the trial court sentenced *551 him to two years' imprisonment. Both at trial and on appeal the defendant is represented by retained counsel.
Both at trial and on appeal, the defendant attacks the legal sufficiency of the evidence to support his conviction. The evidence is conflicting and subject to contradictory inferences. In stating the facts this Court will only give a general outline of the evidence and will not attempt to summarize all the testimony presented during the three day trial of the defendant.
In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App.1976); Edson v. State, 53 Ala.App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala.App. 4, 325 So.2d 520, cert. denied, 295 Ala. 398, 325 So.2d 531 (1975).
Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96 (Ala.Cr.App.1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423 (Ala.Cr.App.1976).
Around the first of May, 1975, Representative Thomas Reed introduced House Bill 247 into the Regular Session of the Alabama State Legislature. This bill would have provided for and created a county racing commission for the regulation, licensing and supervision of dog racing and wagering thereon in Macon County. Reed represented Macon County in the State House of Representatives.
Senator Thornton Dudley Perry was a State senator and his senatorial district included Macon County. Due to the recognized practice of "legislative courtesy", Senator Perry's approval of the bill was necessary for its adoption by the Senate.
Within the first few days of the session Representative Reed came across to the Senate Chamber in the Capitol in Montgomery and handed Senator Perry a copy of House Bill 247. Senator Perry testified that on that occasion Representative Reed stated:
"Here's the dog racing bill . . . There's a provision in it for an attorney for the track and there's no limit on the salary. We've got you taken care of. I'll talk to you about it later."
An amended version of the original House Bill 247 was adopted by the House of Representatives on May 29, 1975. On June 3rd, it was finally transmitted to the Senate.
After Senator Perry publicly announced his opposition to the dog racing bill "on moral grounds" his law office in Tuskegee was firebombed on May 28, 1975.
Senator Perry first talked with the defendant concerning House Bill 247 on May 30, 1975. By coincidence the defendant and Senator Perry met outside Perry's law office in Tuskegee. Their conversation continued in the office. Senator Perry testified that the defendant told him that, "There's big money in this thing for me and you and Thomas Reed and I want to talk to you about getting this bill passed and we're going to do it one way or the other, either with you or without you". The defendant stated that he was there for the purpose of trying to get Senator Perry "to agree to go along with the bill because it would be easier than having to do it any other way".
The defendant asked Perry if he had talked with Representative Reed about the bill and Senator Perry told him that he had only spoken with the Representative once and that was at the Capitol when Reed brought the bill over the day it was introduced. The defendant requested Perry to talk to Reed and, at the request of the defendant, Perry had his secretary contact the Representative by telephone. The defendant *552 spoke with Reed on the telephone, told him that he and Perry were "talking about the dog track bill" and asked "Mr. Reed if he would come down to the office and talk with us".
Later that same afternoon of May 30th, as arranged, Reed and the defendant arrived together at Senator Perry's law office. After Perry told the defendant and Reed that he would not change his position on the dog racing bill "Mr. Reed and Mr. Williams began to talk with one another back and forth there in my (Perry's) presence". Reed told the defendant that Perry was "taken care of in the bill" and the defendant told Reed that he wanted to help persuade Perry to change his mind but that he was not going to do anything unless "absolutely certain that Dudley will be taken care of". Reed then told the defendant that Perry "is taken care of. There's a provision in the bill for an attorney and there are no limits on the salary for the attorney." Reed told the defendant the salary could be from $20,000 to $50,000 a year and asked Perry "What do you want out of it." Perry stated that he would not and could not change his position explaining that he had been threatened and picketed and that if he were to change his position it would appear that he could be made to change his position on other matters in the future through the use of similar tactics. Senator Perry testified that Representative Reed then told him:
"that he would assure me that if I would change my position I would not be intimidated or would not receive any more telephone calls of that nature and that my office would not be picketed and that I could rest easy that they could control the threats and so forth."
* * * * * *
"Mr. Williams made a similar assurance and went on to say that he could also stop the newspaper which he owned and the local radio station from making, from editorializing against me on these matters."
That afternoon Senator Perry went to his home and reported the meetings to F.B.I. agent Carmelle "Skip" Grafinini.
Under instructions from the F.B.I., Senator Perry arranged a meeting with the defendant and Representative Reed. On June 4, 1975, Reed and the defendant came to Perry's law office in Tuskegee. Agent Grafinini and several other agents were in the office but out of sight.
Senator Perry told the defendant and Reed that he was under a great deal of pressure as a result of the threats that had been made against him and his family. He told them that he was now ready to talk about the bill and wanted to know more about the offer of the $50,000 a year for the attorney's job.
Reed told Perry that "the job as attorney for the track was put into the bill for me (Perry). He (Reed) said that they were instructed to do so by the big wheels in Montgomery or something to that effect." As instructed by the F.B.I., Perry asked Reed and the defendant how he could be sure that he would be appointed attorney for the track. Reed responded that "You'll just have to trust me". The defendant told Perry that he was planning on being one of the commissioners for the track and promised Perry that he would support him for attorney as a commissioner.
Perry told them that he had heard that there was "front money" available and that he wanted a part of it. Reed told Perry that there had been such money available but that Perry's opposition to the bill had "tied up the money" and there would be none available until he changed his position. The defendant then said that he would like to act as a "go-between, an intermediary", between whoever had the money and Reed and Perry "to dispense the money".
The following day, at the State Capitol in Montgomery, Representative Reed approached Senator Perry and asked if there were anything else he could do or say to help Perry change his mind and "pass the bill out". Perry testified that Reed told him he was "a young lawyer" who was "moving up" and said that "upward mobility is what it's all about". Reed told him that this was an opportunity for him to *553 make up to $50,000 a year or more, and that he couldn't afford "to pass that up". Reed told him he should go ahead and "pass that bill out so that you can take this money".
Representative Reed also told Perry there was a way he could be "assured of being the attorney for the track", and told him that they could amend the bill so as to provide that each of them would appoint two of the five racing commissioners; that Reed would appoint the defendant as one of his appointees; that Williams had already promised Perry he would vote for Perry as attorney, and that Perry could appoint two commissioners who would also have promised to vote for him as attorney. This would assure Perry of three votes, a majority of the commission, for the job as attorney for the commission. Reed then assured Perry that his second appointee would also vote for Perry as attorney, giving him four out of five votes. Senator Perry testified that after this meeting he telephoned F.B.I. Agent Grafinini from the Capitol and informed him of the conversation with Thomas Reed.
Perry testified that each legislative day Representative Reed would come across to the Senate Chamber and ask if Perry had changed his position on the dog racing bill, and would ask if there were anything else that he, Reed, could do. They talked again about the attorney's job on these occasions.
On June 9, 1975, Senator Perry had a conversation with the defendant at his home. Agent Grafinini and several other agents were present in another part of Perry's house and tape recorded this conversation. At trial, after the State had laid a proper predicate, this tape recording was played for the jury.
During this conversation, the defendant told Perry that he was going to attack Perry publicly on the radio and through his newspaper if Perry did not change his position on the bill and tell the defendant that he would pass the dog track bill. The defendant told Perry that there was "a lot of money to be made" from the dog track bill and that "we ought to make it"; that he and Thomas Reed had "had some discussions about it" but that he and Perry "could probably make a lot more money".
During this same conversation, the defendant told Senator Perry that he and Perry, as a racing commissioner and as attorney for the track, respectively, could together use their influence to solicit bribes from the people who sought to build and operate the dog track.
Senator Perry testified that the defendant also told him during this same conversation that Representative Thomas Reed had told him, the defendant, that he, Reed, would appoint the defendant as a racing commissioner in exchange for the defendant's promise to kick back to Reed $2,000 each year from his proposed $15,000 annual salary.
The conversation ended when the defendant agreed to withhold any public attack on Perry until the following day when Perry was to notify the defendant of his intention to either support or oppose the bill.
On the morning of June 10, 1975, Senator Perry had a conversation with Representative Reed at Perry's home. The conversation was also tape recorded by the F.B.I.
Perry testified that Reed told him during the conversation that they should go ahead and amend the bill as they had discussed in Montgomery so as to provide that each of them would appoint two of the five racing commissioners. Reed further told Perry that he would appoint the defendant to the commission, and repeated the promise he had previously made to Senator Perry in Montgomery, that all of his appointees to the commission would vote for Perry as attorney. Reed told Perry that $50,000 was "a lot of money" and again spoke of "upward mobility".
Reed also told Perry that Perry shouldn't take but $25,000 the first year as attorney for the racing commission, but that it could be raised to $50,000 the second year. Reed stated there might be no limit to what Perry could "ultimately make out of it". Perry testified that Reed told him that it was his opinion that Perry, as attorney for the racing commission, would only have to *554 spend about two hours a week working for the commission.
During this same conversation, Reed asked Perry if Perry would not let Reed have two or three thousand dollars a year, or tell someone to let Reed have two or three thousand dollars a year should Reed get "in a tight" and need money.
Representative Reed told Senator Perry that he would bring him the proposed amendment to the bill that afternoon and that the amendment would provide that each of them appoint two of the racing commissioners, thereby assuring Senator Perry of the majority vote for attorney, consisting of the votes of Perry's two appointees and the vote of the defendant whom Reed would appoint.
Senator Perry then testified that later that same day, June 10, 1975, he saw Representative Thomas Reed in the Senate Chamber of the Capitol in Montgomery. Perry testified that Reed came to him and handed him a group of amendments and told him it was the amendment they had discussed which would change the appointive authority for the dog racing commission. Perry told Reed that he had decided not to change his position on the bill and that he would not vote to pass the bill, at which point Reed took the amendments out of Perry's hand and walked away.
In his own defense the defendant testified that Senator Perry initiated the conversations about front money and denied any plan by Reed or himself to try to bribe Perry. The defendant admitted being interested in finding the "front money" and getting some for himself if it were legal. He also admitted "trying to make some money out of the bill".
Applying the rules set forth earlier in this opinion, we find the evidence sufficient to support the jury's verdict of guilty "as charged". A thorough review of all the evidence convinces this Court that the defendant did directly, as well as indirectly through his collusion with Thomas Reed, offer or promise money or a thing of value, privilege or personal advantage to a member of the Legislature to influence him in the performance of his public and official duties.

I
Initially the defendant argues that he committed no criminal act in Montgomery County, therefore could only be tried in Macon County. The State contends that a conspiracy existed between the defendant and Thomas Reed and that Reed's actions in Montgomery County properly gave that county venue. Consequently before the question of venue can be answered, it must first be determined what relationship, if any, existed between Reed and the defendant.
By statute the distinction between accessories before the fact and principals has been abolished in this state. Title 14, Section 14, Code of Alabama 1940, now Ala.Code Section 13-9-1 (1975). Thus all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must be indicted, tried and punished as principals. Scott v. State, 30 Ala. 503 (1857); Watkins v. State, 357 So.2d 156 (Ala.Cr. App.1977), cert. denied, 357 So.2d 161 (Ala. 1978). Where two or more persons enter into a conspiracy to accomplish some unlawful act, any act done by any one of them in pursuance of the original conspiracy is, in contemplation of law, the act of all. Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1951); Martin v. State, 89 Ala. 115, 8 So. 23 (1889); Amos v. State, 83 Ala. 1, 3 So. 749 (1887). The criminal law does not attempt to assess guilt in complicity by any device of percentage of fault, rather, where joint action or aiding and abetting appear, all participating can be found equally guilty. Dubose v. State, 50 Ala.App. 652, 282 So.2d 91 (1973). Where two or more persons enter upon a common undertaking which contemplates the commission of a crime, each is equally guilty of the offense committed, even though he did not commit an overt act. Haney v. State, 20 Ala.App. 236, 101 So. 533, cert. denied, 211 Ala. 614, 101 So. 537 (1924).
*555 A conspiracy is provable either by direct or circumstantial evidence. Collins v. State, 138 Ala. 57, 34 So. 993 (1903). Indeed a conspiracy is rarely proven by positive or direct testimony but usually by circumstances. Muller v. State, 44 Ala.App. 637, 218 So.2d 698, cert. denied, 283 Ala. 717, 218 So.2d 704 (1968). However, before the acts of a confederate are admissible against a defendant, prima facie evidence only of a conspiracy is necessary. Williams v. State, 81 Ala. 1, 1 So. 179 (1887).
Any word or act contributing to the commission of a felony, intended to incite or encourage its accomplishment, makes one a co-conspirator. Conley v. State, 354 So.2d 1172 (Ala.Cr.App.1977). The words "aid and abet" comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary, and no particular acts are necessary. Radke v. State, 292 Ala. 290, 293 So.2d 314 (1974). The defendant's actual participation need not be proved by positive testimony; the jury is to determine whether it exists and the extent of it from the conduct of the parties and all the testimony adduced. Watkins, 357 So.2d at 159. The trial judge must determine initially whether there is prima facie evidence that a conspiracy exists. Once he so determines the existence of such a conspiracy becomes a question for the jury. Strange v. State, 43 Ala.App. 599, 606, 197 So.2d 437, cert. dismissed, 280 Ala. 718, 197 So.2d 447 (1966).
Reviewing the State's evidence in this case we have no difficulty in determining that a prima facie case of conspiracy was established. Though we would not even begin to detail the numerous facts and inferences which would support the State's conspiracy theory, we single out the agreement between the defendant and Reed whereby Reed would appoint the defendant as a commissioner and as a commissioner the defendant would vote for Perry as attorney. Both Reed and the defendant stated that the harassment and intimidation of Senator Perry would stop if he would agree to pass the bill. While no doubt the State's evidence supports a finding that both Reed and the defendant sought some individual and personal financial gain, the evidence also fully supports a finding that they willingly cooperated with each other in illegally attempting to convince Senator Perry to vote for the dog racing bill.
That prima facie evidence of a conspiracy existed is as much as admitted by the defendant in his appellate brief when he argues that Reed and the defendant were being manipulated by Perry: "The defendant helped dig his own trap, as he admittedly testified, by trying to make Perry think that he and Reed were working together, while the truth was they were not." This was the ultimate question to be determined by the jury in view of the defense presented: Were the defendant and Reed "innocent victims of a classic frame up" or were they joined in both agreement and action towards the goal of illegal personal enrichment and the corruption of a State Senator?
We will not belabor the point. Under the evidence presented the question of the existence of a conspiracy was for the jury. The court charged the jury on the issue of conspiracy. The evidence supports their finding that such a conspiracy existed.
To be convicted as an aider and abettor the indictment may charge the substantive crime. Such does not violate any constitutional provision. Stokley, supra; Watkins, 357 So.2d at 159.

II
Having established the presence of evidence sufficient to support the inference of the existence of a conspiracy between Reed and the defendant, we may now decide the issue of proper venue.
In a criminal prosecution the accused has a constitutional right to a trial "[in] the county or district in which the offense was committed". U.S.Const. amend. VI; Ala.Const. art. 1, § 6. This constitutional guaranty is satisfied when part of the acts constituting the crime are *556 committed in the county in which the indictment is returned. 22 C.J.S. Criminal Law § 177 (1961). By statute in Alabama it is provided that:
"When an offense is committed partly in one county and partly in another or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, venue is in either county." Ala.Code Section 15-2-6 (1975).
The controlling purpose of this section was the abrogation of the rule of common law that, when an offense was constituted by a series of acts, a part of which was done in one county and a part in another, there could be no prosecution in either unless so much was done in the one as would constitute a complete offense. Brown v. State, 108 Ala. 18, 23, 18 So. 811 (1895). See also 30 A.L.R.2d 1265 (1953) for the construction and effect of similar statutes. "A single, indivisible offense, not consisting of several parts is not within the operation of the statute." DeGraffenried v. State, 28 Ala. App. 291, 293, 182 So. 482, 484 (1938). Before the statute can become operative in a criminal case, one of two things must appear:
"either the offense must be divisible and each part must be unlawful in and of itself, and committed at a different time and place, or it must consist of more than one act, each of which acts, or the effect of each must constitute an unlawful element of the offense, without the presence of which the offense could not be consummated." DeGraffenried, 28 Ala.App. at 293, 182 So. at 484.
Even though the evidence is clear that the defendant never performed a single act in Montgomery County during the existence of this conspiracy, venue was proper in that county. Because of the conspiracy, the acts of Reed in furtherance of the conspiracy were the acts of the defendant even though the defendant may not have been present. Stokley, supra. "(W)here a statute provides that an accessory before the fact may be prosecuted and convicted as for a substantive felony, his crime is cognizable in any court having jurisdiction of the principal." 22 C.J.S. Criminal Law § 184 (1961).
Representative Reed's actions in Montgomery must be examined to determine whether they are sufficient to meet the test set forth in DeGraffenried, supra, for invoking Section 15-2-6. Reed had four meetings with Senator Perry in Montgomery concerning the dog racing bill.
(1) Around the first of May, 1975, at the opening of the 1975 Regular Session, Representative Reed handed Senator Perry a copy of the dog racing bill and told him that "We've got you taken care of". This meeting which we have described earlier was innocuous in and of itself. Only when coupled with subsequent events does it assume any significance.
(2) On June 4th Reed approached Perry in the Capitol in Montgomery and assured Perry that he could be the attorney for the track. Reed stated that the bill could be amended so that each of them could appoint two of the five racing commissioners. Reed stated that he would appoint the defendant who had already promised that he would vote for Perry as attorney.
(3) Daily Reed visited the Senate Chamber to ask Perry if he had changed his mind and to see if there were anything else that he could do.
(4) On June 10, 1975, Reed handed Perry an amendment and said that it was the amendment they had discussed earlier that day which would change the appointive authority for the dog racing commission.
When all the evidence is considered we think it is sufficient to support a finding that Reed's actions in Montgomery were in furtherance of the conspiracy. The attempted bribery of Senator Perry must be viewed as a continuing transactionone occurring not at one specific meeting but over a period of several. Goodman v. State, 52 Ala.App. 265, 291 So.2d 358 (1974). One meeting is linked to the other so that together they form a total or whole transaction. Hence venue was proper in either Macon or Montgomery County.

*557 III
The defendant argues that the crime of bribery was completed before Reed met with Perry on the afternoon of June 10th. This argument has no merit.
The correct rule as recognized by the defendant is stated in Edwards v. State, 279 Ala. 371, 185 So.2d 393 (1966):
"Evidence showing the act or declaration of one conspirator is admissible against the other conspirator when done or made `in furtherance of the common design.'"
* * * * * *
"That rule does not, however, make evidence showing the declaration of one confederate admissible against the other when the declaration was not made until after the purposes of the unlawful combination had been accomplished." Edwards, 279 Ala. at 381, 185 So.2d at 403-404 (Emphasis added).
A conspiracy involving the commission of a substantive crime may extend beyond the actual commission of the offense and the fact that a conspiracy has ended does not preclude its continuance for various secondary purposes. Hence continuing conspiracies have been recognized where the evidence warrants a finding of accused's participation in a conspiracy to suppress or fabricate evidence of the crime after its commission, Levison v. State, 54 Ala. 520 (1875); Lancaster v. State, 214 Ala. 2, 106 So. 617 (1925); Latham v. State, 56 Ala. App. 234, at 246-247, 320 So.2d 747, affirmed, 294 Ala. 685, 320 So.2d 760 (1975); Dailey v. State, 233 Ala. 384, 171 So. 729 (1937), or a continuing conspiracy to divide the fruits of the crime. C. Gamble, McElroy's Alabama Evidence, § 195.03(6) (3rd ed. 1977).
Here it is obvious that the conspiracy to bribe Senator Perry embraced not only the actual act of bribery itself but the passage of the bill and the appointments of Williams as a commissioner and Perry as the attorney. These were the purposes of the unlawful combination. When Senator Perry ended the matter on June 10, 1975, by informing Reed that he would not change his position of opposition to the dog racing bill, Reed and the defendant were still in the process of attempting to unlawfully influence his decision. Hence it is clear that the conspiracy was far from completed. Bynum v. State, 348 So.2d 804 (Ala.Cr.App. 1976), cert. quashed, Ex parte Bynum, 348 So.2d 828 (Ala.1977).

IV
The indictment charges that the defendant did "offer or promise a thing of value or personal advantage". The statute condemns the unilateral offer or promise of a bribe. Proof of a bilateral agreement, that is, that the officer accepted the bribe, is not required. See Caruthers v. State, 74 Ala. 406 (1883).
That Thomas Reed was convicted of attempting to offer or promise a thing of value, or that he was even convicted at all, is of no consequence to the case against the defendant. It is not required that the principal be convicted or even that his identity be established. United States v. Merriwether, 329 F.Supp. 1156, affirmed, 469 F.2d 1406 (5th Cir. 1971). In a case of crime admitting degrees of guilt, where the principal offender has been tried and convicted of one of the lower degrees, the one indicted as an aider and abettor can afterwards be tried and convicted of a higher degree. Bridges v. State, 48 Ala.App. 249, 263 So.2d 705 (1972).

V
Count one of the indictment concerned "House Bill 247". Count two was identical except that it concerned "proposed amendments to House Bill 247". The trial court properly denied defense counsel's motion to require the State to elect. The rule is that the court will not compel an election unless it appears either from the indictment or the evidence that an attempt is made to convict the accused of two or more offenses growing out of separate and distinct transactions. Ex parte State, 197 Ala. 419, 73 So. 35 (1916); Butler v. State, 91 Ala. 87, 9 So. 191 (1890); Breedwell v. State, 38 Ala.App. 620, 622, 90 So.2d 845 *558 (1956). Here "the purpose and effect of the joinder was to meet the different aspects in which the evidence may present a single transaction" or a single offense. Breedwell, 38 Ala.App. at 622, 90 So.2d at 846. Election was not required. Wooster v. State, 55 Ala. 217 (1876); Mayo v. State, 30 Ala. 32 (1857).

VI
The defendant alleges that the State's exercise of its thirteen peremptory challenges to strike thirteen blacks from the jury venire constituted a denial of a fair trial by an impartial jury.
Although one black did sit on the defendant's jury, a defendant is not entitled to a jury containing members of his race. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In Swain, the United States Supreme Court considered and decided the very issue the defendant presents.
"In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it." Swain, 85 S.Ct. at 837.
The courts of this state have consistently followed the holding of Swain. Radford v. State, 348 So.2d 880, 882 (Ala.Cr.App.1977); Liptroth v. State, 335 So.2d 683 (Ala.Cr. App.), cert. denied, 335 So.2d 688 (Ala.1976). Under the authority of Swain, supra, the defendant's motion to quash the venire or dismiss the indictment was properly denied.

VII
The trial court acted within its discretion in granting the State's request to quash the subpoena duces tecum directed to Senator Perry. In denying "each and every matter requested as they are requested in the subpoena" the court specifically noted that the requests were not related to the Macon County dog track bill.
"COURT: That's not what you're asking for, not as they relate to any dog track bill in Macon County. As I read this subpoena duces tecum you want any and everything he has ever had about anything and anywhere and whatever, any dog track bill, any deed, any mortgage, any claim, any trust, all monies, you know."
* * * * * *
"Is that what you are asking for then? And when you say all records, deeds, mortgages, notes and so forth, 7345, that's what you are saying, as they relate to this Macon County dog track bill?
"MR. CHEEK (Defense Counsel): No, Sir.
"COURT: That's what would be relevant or irrelevant about it. If you want all of his deeds and mortgages and all of his notes, that's one thing. If you want any deed, mortgage or note as they relate to the Macon County dog track bill and his relationship that may be with it then we may be getting into something relevant. As this subpoena duces tecum relates, I stand by my ruling denying each and every one of them. I was just trying to point out to you my feeling as to why the ruling was as it was."
* * * * * *
"Well, then, at that time if and when that matter becomes relevant, if you have any information or can produce anything to make it relevant that Senator Perry may have been doing what he was doing and showing some bias and prejudice so he could put the dog track on his property then it would be relevant and then you *559 can ask for the deed where it would show he was going to put it on there, and then it would be relevant."
The rule is stated in Ex parte Hart, 240 Ala. 642, 646, 200 So. 783, 785-786 (1941):
"Touching the showing to be made on application for such writ [subpoena duces tecum], it is written: `On a motion or application for a subpoena duces tecum at least where its issuance is opposed or the rightfulness thereof assailed, it must be made to appear that the evidence which the books or papers of which production is asked will furnish is competent, and relevant and material to the issues before the court. * * * Facts which will enable the court to judge of the relevancy and materiality of the documents must be stated.' 70 C.J. p. 52, Section 39."
In Alabama a subpoena duces tecum addressed to persons not a party to the action is authorized by Title 7, Section 489, Code of Alabama 1940, now Alabama Code Section 12-21-2 (1975). This section looks to the production of books and documents for use as evidence on the trial of a case. It excludes the notion that it also embraces discovery as one of its purposes. Ex parte Anniston Personal Loans, Inc., 266 Ala. 356, 96 So.2d 627 (1957).

VIII
The constitutional guaranty of a public trial does not apply to "conferences on questions of law which take place during the trial but out of the hearing of the jury". 21 Am.Jur.2d Criminal Law, Section 260 (1965); 23 C.J.S. Criminal Law § 963(4)b (1961).
"It is proper to hold in camera sessions where the subject matter of the conferences between court and counsel consists solely of questions of law, as opposed to matters advanced for the consideration of the triers of fact."

People v. Murphy, 35 Cal.App.3d 905, 926, 111 Cal.Rptr. 295, 307 (1973).

IX
The trial court did not commit reversible error in overruling the objection of defense counsel to Senator Perry's testimony that House Bill 247 was introduced to legalize dog racing in Macon County. The objection was not made until after the Senator had given a responsive answer to the prosecutor's question. Therefore the objection came too late. Willingham v. State, 261 Ala. 454, 74 So.2d 241 (1954); Grooms v. State, 228 Ala. 133, 152 So. 455 (1934); Chambers v. State, 356 So.2d 767 (Ala.Cr. App.1978). Additionally, testimony which is apparently illegal upon its admission may be rendered "prejudicially innocuous" by subsequent legal testimony to the same effect or from which the same facts can be inferred. Yelton v. State, 294 Ala. 340, 342, 317 So.2d 331 (1974); Zorn v. State, 20 Ala.App. 404, 102 So. 722, cert. denied, 212 Ala. 414, 102 So. 723 (1924). The admission of incompetent evidence is harmless error where the fact to which such evidence relates is otherwise established by competent evidence. Falkner v. State, 151 Ala. 77, 44 So. 409 (1907). The introduction of a copy of House Bill 247 cured any error in the admission of Senator Perry's testimony on this matter.

X
For these same reasons the defendant was not "irreparably prejudiced" by Senator Perry's references to "instructions from the F.B.I." where the agent who gave the Senator those instructions later testified that he did so, stated the extent of the instructions and was cross examined by defense counsel. Roynica v. State, 54 Ala. App. 436, 443, 309 So.2d 475 (1974), cert. denied, 293 Ala. 772, 309 So.2d 485, cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 85 (1975); Wright v. State, 343 So.2d 795 (Ala.Cr.App.), cert. denied, 343 So.2d 801 (Ala.1977); Stokes v. State, 13 Ala.App. 294, 69 So. 303 (1915).

XI
The trial court did not err in sustaining the State's objection to defense counsel's question of Senator Perry, "Did you consider it to be a bribe then?" The defendant's argument that Perry's "subjective *560 state of mind" or "belief" of whether he was being offered a thing of value was "critical" towards establishing a defense is without merit. Under the terms of the statute under which the defendant was indicted the offense condemned is the unilateral offer of a bribe. Acceptance of the bribe, the thing of value, is of no consequence and a bilateral agreement is not required. See McDonald v. Headrick, 554 F.2d 253 (5th Cir. 1977) (construing Title 14, Section 64, Code of Ala.1940).
The question to Senator Perry called for a conclusion and objection was therefore properly sustained. Stewart v. State, 27 Ala.App. 315, 172 So. 675, cert. denied, 233 Ala. 480, 172 So. 678 (1937). A witness may not testify to matters directly in issue. Harris v. State, 39 Ala.App. 139, 99 So.2d 201, cert. denied, 266 Ala. 697, 99 So.2d 204 (1958). A witness should state facts regarding matters inquired about and allow the jury to reach its own conclusions. Knight v. State, 160 Ala. 58, 49 So. 764 (1909); Wade v. State, 349 So.2d 141 (Ala. Cr.App.1977); Smith v. State, 21 Ala.App. 460, 109 So. 294 (1926).

XII
The trial court acted within its discretion in sustaining the State's objection to defense counsel's question of whether Senator Perry "represent(ed) any governmental agencies as an attorney while you were in the Senate?" The defendant was allowed a searching and sifting cross examination. However the scope and extent of cross examination are within the discretion of the trial court. In the absence of the abuse of that discretion its ruling will be upheld. Connell v. State, 294 Ala. 477, 318 So.2d 710 (1974); Turner v. State, 289 Ala. 97, 265 So.2d 883 (1972). This Court rejects the defendant's contention that the "answer to that question was directly relevant to Williams' defense that instead it was Perry who was soliciting a job, not Williams' offering one".

XIII
The trial court refused to allow Macon County Commissioners Harold Noble and Otis Pinkard to testify that Senator Perry had solicited the job of county attorney from them. The court sustained the State's objection after requesting defense counsel to "show me some relevance as to whether or not Mr. Perry ever asked to be the county attorney, what relevance would that have toward any conduct or bias or prejudice or anything?"
The in camera testimony of each witness shows that Perry allegedly asked for the job in 1976 or 1977 at a time when all the criminal events embraced within the charged crime had ended.
Called to testify for the defense Senator Perry denied ever asking Mr. Noble around the period of January, 1977, in Tuskegee, if he could not become the county attorney. Out of the jury's presence Mr. Noble testified sometime in 1976 "I couldn't tell you what time it was or where it was or when but he met me one day and said `Let me be ya'll's attorney'". Mr. Noble, on cross examination testified that to his knowledge Perry never applied to the commission for the job as attorney for the County Commission.
Mr. Pinkard testified out of the jury's presence that at the commission meeting in February, 1977, "someone made a statement that Senator Perry had contacted them relative to becoming county attorney and, of course, another commissioner said that, `Well, he contacted me, too'". This was before the meeting started and it was not discussed in an official manner.
In view of the showing made by defense counsel, or rather the lack of any showing, we fail to see the relevance of what Senator Perry did subsequent to the events alleged in the indictment. A witness cannot be cross examined, as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him. Blakey's Heirs v. Blakey's Executrix, 33 Ala. 611 (1858). A witness cannot be impeached by being contradicted upon an immaterial matter. Goldin v. State, 271 Ala. 678, 127 So.2d 375 (1961); Weeks v. State, 346 So.2d 1181 (Ala.Cr.App.1977); Kilpatrick v. State, *561 51 Ala.App. 352, 285 So.2d 516, cert. denied, 291 Ala. 628, 285 So.2d 525 (1973).
Furthermore, absolutely no predicate whatsoever was laid to impeach Perry through Mr. Pinkard's testimony.

XIV
The trial court did not err in refusing to exclude two answers given by Agent Grafinini on cross examination that were in response to and responsive to questions asked by defense counsel. Error cannot be predicated upon the admission of testimony that is elicited by defense counsel and which is responsive to defense questions. Truex v. State, 282 Ala. 191, 210 So.2d 424 (1968); Brown v. State, 338 So.2d 1050 (Ala.Cr.App.1956). Additionally, we fail to see how Agent Grafinini's two responses, that he knew Perry's office was firebombed because "it was reported to me by the Alcohol, Tobacco and Firearms" and that he knew the tape recording was taken to "our headquarters in Mobile" because "the chief clerk told me it was down there", could have in any way injured this defendant. Rule 45, Alabama Rules of Appellate Procedure.
The statement of Senator Perry objected to as hearsay was not hearsay. He was simply testifying as to what he said to the defendant and Representative Reed not what someone had told him.

XV
The defendant alleges that he was denied a fair trial because the trial judge failed to recuse himself and because his rulings "consistently show a pattern of siding with the prosecution". Defendant's contentions are grounded on the fact that the trial judge made 187 rulings adverse to the defendant and only 78 rulings adverse to the State.
The law on this subject is clear and does not need to be repeated here. In re White, 53 Ala.App. 377, 300 So.2d 420, cert. denied, 293 Ala. 778, 300 So.2d 439 (1974); Payne v. State, 48 Ala.App. 401, 265 So.2d 185 (1972). It is presumed that a judge is qualified and unbiased. The defendant alleging bias on the part of a judge has a substantial burden to show the grounds therefor. Schillaci v. State, 347 So.2d 556 (Ala.Cr.App.), cert. denied, 347 So.2d 559 (Ala.1977). It would be a simple matter to determine bias or prejudice merely by weighing which side has received the most adverse rulings. However, the mere number of adverse rulings a defendant receives during the course of a trial is not, in and of itself, any indication of any bias or prejudice on the part of the trial judge. The record before this Court does not support the defendant's allegations of heavy prosecutorial bias but, rather, reflects that he received a fair trial at which he was represented by diligent and aggressive legal counsel.

XVI
The defendant was indicted and tried before the effective date of Alabama Code Section 15-11-1 (1975). Consequently he was not entitled to a preliminary hearing as a matter of right. Ex parte Campbell, 278 Ala. 114, 176 So.2d 242 (1965); Scaife v. State, 337 So.2d 146 (Ala.Cr.App.1976).

XVII
The record shows two arraignments of the defendant with no explanation as to why this occurred. The defendant alleges that he was not represented by counsel at the first arraignment and consequently a second arraignment was necessary. The record shows that the defendant was present with counsel at the arraignment on September 26, 1976, and on October 18, 1976. This Court cannot consider assertions in brief not supported by the record. Dockery v. State, 269 Ala. 564, 114 So.2d 394 (1959); Dates v. State, 282 Ala. 457, 212 So.2d 845 (1968).
This Court has searched the record for error prejudicial to the defendant and found none. We have studied the voluminous briefs filed by counsel and have considered their arguments. After review it is our judgment that the defendant received a fair trial under the Constitution and laws of the United States and the State of Alabama. *562 The judgment of the circuit court is therefore affirmed.
AFFIRMED.
HARRIS, P. J., and TYSON and DeCARLO, JJ., concur.
BOOKOUT, J., dissents.
BOOKOUT, Judge, dissenting:
I am unable to concur in Part II of the majority opinion concerning venue.
The evidence does not show the existence of a conspiracy between Williams and Reed at the time Reed first approached Perry in the senate chamber in Montgomery. Williams did not come into the picture until his coincidental meeting with Perry in Macon County on May 30, 1975. Later that same day, the conspiracy came into full bloom when Reed and Williams met with Perry and Reed offered Perry the attorney's job if Perry would change his position on the proposed dog racing legislation.
The evidence shows both Williams and Reed to be parties to the offer made in Macon County, which constituted the completed crime of bribery pursuant to Title 14, § 73, Code of Ala. 1940, which makes it an offense to "offer . . . or promise any money, or thing of value . . . or personal advantage, to any . . . member of the legislature to influence him in the performance of any of his public or official duties." Thus, the offer or promise may constitute the offense of bribery without actually giving the thing of value. Reed v. State, Ala.Cr.App., 372 So.2d 872 (1978). Therefore, the only bribery in which the evidence shows Williams to be implicated took place in Macon County. Perry declined their offer, and the evidence fails to show Williams to be a party to any subsequent attempts by Reed in Montgomery County to induce Perry to change his mind. The evidence does not show any further participation by Williams outside Macon County, nor does it show knowledge or acquiescence on his part that Reed was pursuing the matter later in Montgomery.
To be tried in the proper venue is a constitutional right guaranteed by Article I, § 6, Constitution of Alabama 1901. The authority cited by the majority to try Williams in a county in which he committed no overt act is 22 C.J.S. Criminal Law § 184. No Alabama cases supporting that proposition are noted under that section in C.J.S., and none are cited in the majority opinion on that precise point. The compilation of cases in C.J.S., cited supra, are from foreign jurisdictions, many of which are based upon specific conspiracy-venue statutes.
Title 14, § 14, Code of Ala. 1940 (now § 13-9-1) places guilt equally upon principals and accessories, however, that statute does not relate to venue and does not establish a per se rule that an accessory is triable in any court having jurisdiction over the principal. Under § 14, supra, it is possible for an accessory to be equally guilty as the principal by aiding and abetting in the commission of the offense although not present at the time of its commission. Here, the evidence establishes that Reed alone made the bribery offer in Montgomery County. In order for Williams to be guilty as an accessory to those offenses, I believe the State must show more than the fact that Williams and Reed jointly committed a similar offense at another time in Macon County.
The evidence fails to show any criminal act committed in Montgomery County by Williams, either directly or indirectly. To be guilty of a crime in Montgomery County, though not present, Williams must be shown by the evidence to have aided and abetted Reed in the commission of those offenses. While we may suspect that Williams had knowledge of and consented to Reed's conversations with Perry in Montgomery, still the State's evidence has failed to prove such. Under the evidence presented in the instant record, the venue was established as being in Macon County.

ON REHEARING
BOWEN, Judge.
The evidence indicates that the conspiracy between Reed and the defendant began on May 30, 1975, and continued until June *563 10, when Senator Perry told Representative Reed that he had decided not to change his position on the dog racing bill. As late as June 9 the defendant threatened that he was going to attack Perry publicly unless he agreed to vote for the bill. The evidence clearly shows that during this time both Reed and the defendant were involved in continued efforts to bribe Senator Perry.
As Part II of the majority opinion points out, Reed, in furtherance of the overall scheme which he and the defendant had engineered and with which the defendant was in decided agreement, continued to pursue their contrivance in Montgomery. The plan to which the defendant had agreed and was hopeful of achieving did not, in fact, end in Macon County. It was continued in Montgomery through his co-conspirator's efforts.
Reed's June 4th approachment of Perry at the Capitol, after the May 30th conversations between the defendant Reed, and Perry in Tuskegee, and Reed's daily visits with Perry in the Senate Chamber are proof that the scheme or conspiracy to accomplish the bribe was continued and kept very much alive in Montgomery County. It does not matter that the defendant may not have entered the scheme until May 30th after Reed had initiated it in early May. When, by prearrangement, or on spur of the moment, two or more persons enter upon a common enterprise and a criminal offense is contemplated, then each is a conspirator, and if purpose is carried out each is guilty of the offense, whether he did any overt act or not. Teague v. State, 245 Ala. 339, 16 So.2d 877 (1944). The conversations in Montgomery simply cannot be filtered out and separated from those in Macon County. They were all part of one transaction, one overall plan. Venue was thus proper in either county. Alabama Code Section 15-2-6 (1975).
It does not matter whether the defendant had actual knowledge of Reed's meetings with Perry, whether he intended for Reed to speak with Perry in Montgomery or even whether he acquiesced to such meetings.
"(W)hen two or more persons join in an unlawful enterprise each is responsible for everything which may consequently and proximately flow from the unlawful purpose, whether committed by the accused or not, and whether specifically intended or not. [Citations omitted]. All persons concerned in the commission of a felony, directly or indirectly, are equally guilty. Prophett v. State, 25 Ala.App. 20, 141 So. 257 (1932). And, it is not necessary that the aider be present. Griffin v. State, 26 Ala.App. 292, 158 So. 773 (1935)." Conley v. State, 354 So.2d 1172, 1177 (Ala.Cr.App.1977). (Emphasis added).
When a defendant becomes a participant in an illegal venture for one purpose he becomes one for all. Ladd v. State, 39 Ala. App. 172, 98 So.2d 56 (1957). The evidence is clear that Reed committed no action in Montgomery relevant to the proceedings against the defendant which could possibly be construed as not being within the scope of the conspiracy. In fact, the furtherance of the conspiracy was the central focus of all his meetings with Perry. A member of a conspiracy need not know of every transaction in an illegal scheme so long as he knows of its general scope. United States v. Bobo, 586 F.2d 355 (5th Cir. 1978). Each conspirator appoints the other as his agent. Foster v. State, 43 Ala.App. 435, 191 So.2d 523, cert. denied, 280 Ala. 713, 191 So.2d 527 (1966).
In the early case of Bishop v. State, 30 Ala. 34 (1857), a forgery case, the Supreme Court held that a person, being present at the time in one county, may, through the hands of an innocent agent in another county, utter and publish as true a forged instrument in the latter county, so as to be there guilty of forgery.
"(W)hen the agent, being himself innocent, utters or publishes the forged instrument as true, the offense of uttering is complete, and the guilty principal, though in a distant county, is regarded as the author of the crime; and the crime is regarded as committed by him, at the place where the agent uttered the forged *564 instrument." Bishop, supra, 30 Ala. at 40.
If this proposition holds true where the agent is innocent, then how much truer must it be where the agent is a co-conspirator?
After having carefully considered each argument advanced by the defendant on rehearing, we are of the opinion that the application is due to be overruled.
OPINION EXTENDED;
APPLICATION FOR REHEARING OVERRULED.
HARRIS, P. J., and TYSON and DeCARLO, JJ., concur.
BOOKOUT, J., adheres to dissent.