TYSON, Judge.
Andrew Wilson Hayes and a co-defendant, Thomas H. Redmond, were charged by indictment with securities fraud contrary to the provisions of § 8-6-17 Code of Alabama 1975 as amended.
Initially, there were five counts in the indictment with reference to the appellant, Hayes; however, only two of these counts, counts 17 and 19 were allowed to go to the jury and these two counts form the basis of the conviction against this appellant. They are as follows:
“COUNT SEVENTEEN
“The GRAND JURY of said County charge that, before the finding of this indictment ANDREW WILSON HAYES, alias WILSON HAYES, whose name is to the Grand Jury otherwise unknown than as stated, hereinafter referred to as the DEFENDANT, did, contrary to law, willfully and unlawfully, in connection with the offer, purchase, or sale of a security, to-wit: a Ten Thousand ($10,-000.00) dollar Surplus Note of Southern Heritage Life Insurance Company, hereinafter referred to as a security, directly or indirectly, on or about June 30, 1980, employ a device, scheme or artifice to defraud GEORGE BOLAR in the following manner, to-wit: by causing a Ten Thousand ($10,000.00) dollar Surplus Note of Southern Heritage Life Insurance Company to be issued to GEORGE BOLAR under the terms of which Southern Heritage Life Insurance Company could not legally consider said Note a legal liability until such time as the annual statement filed with the Insurance Department of the State of Alabama disclosed that the surplus of said company was in excess of Two Hundred Thousand ($200,000.00) dollars, the DEFENDANT knowing that the Certificate of Authority of Southern Heritage Life Insurance Company had been revoked by The Alabama Commissioner of Insurance on or about May 15, 1980, which effectively prohibited Southern Heritage Life Insurance Company from obtaining a Two Hundred Thousand ($200,000.00) dollar surplus by engaging in the insurance business, in violation of § 8-6-17(1) of the Code of Alabama (1975), and against the peace and dignity of the State of Alabama.”
“COUNT NINETEEN
“The GRAND JURY of said County charge that, before the finding of his indictment ANDREW WILSON HAYES, alias WILSON HAYES, whose name is to the Grand Jury otherwise unknown than as stated, hereinafter referred to as the DEFENDANT, did, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of a security, to-wit: a Forty-Two Thousand ($42,000.00) dollar Surplus Note of Southern Heritage Life Insurance Company, hereinafter referred to as a security, directly or indirectly, on or about December 20, 1979, employ a device, scheme or artifice to defraud GRACE MAGNOR in the following manner, to-wit: by causing a Forty-Two Thousand ($42,000.00) dollar Surplus Note of Southern Heritage Life Insurance Company to be issued to GRACE MAGNOR under the terms of which Southern Heritage Life Insurance Company could not legally consider said Surplus Note a legal liability until such time as the annual statement filed with the Insurance Department of the State of Alabama disclosed that the surplus of the company was in excess of Two Hundred Thousand ($200,000.00) dollars, the DEFENDANT knowing that Southern Heritage Life Insurance Company did not have any insurance policies in force, that Southern Heritage Life Insurance Company had not received any premium income since June 1, 1979, and that monies obtained through the sale of said Surplus Note would be diverted to the use and benefit *984 of the DEFENDANT, in violation of § 8-6-17(1) of the Code of Alabama (1975), and against the peace and dignity of the State of Alabama.”
The remaining counts were charges against the co-defendant, Thomas H. Redmond, and his appeal has been dismissed on his own motion. Thus, these counts will not be here repeated.
The jury found the appellant “guilty as charged in the indictment” and the trial judge set sentence at five years to run concurrently on each count. In addition, Hayes was to pay restitution in the amount of $47,759.19 to Grace Magnor and, also, pay restitution in the amount of $3,333.00 to George Bolar.
The co-defendant, Redmond, was convicted on five counts and sentenced to ten years to run concurrently on each count and an identical restitution order was entered as to the co-defendant, Redmond.
The appellant raises some seven issues on this appeal. The facts of this cause will be stated with reference to the various issues as they are discussed in this opinion.
I
The appellant, Hayes, filed a motion to challenge the Grand Jury asserting that certain improprieties occurred with reference to the presentation of the State’s evidence to the Grand Jury and that certain procedural irregularities occurred at the time the indictment was returned and requested the trial court to allow him to examine the members of the Grand Jury. This motion is contained on record page 1110 of this record.
A supplemental transcript was filed in this court which is identified as Transcript A and Transcript B. This supplemental transcript contains a stipulation of the attorneys with reference to the hearing before the trial judge concerning the alleged improprieties in presenting the indictment to the trial court.
For brevity, the Attorney General’s office drafted two indictments in this cause. The first indictment contained 19 counts, five of which pertained to the appellant, Hayes, and 14 counts pertained to the defendant, Redmond. This indictment is referred to as the Hayes-Redmond indictment in the stipulation.
The second indictment contained 14 counts pertaining only to the defendant, Redmond. The 14 counts as to the defendant, Redmond, were identical in each indictment.
Some seven witnesses appeared before the Grand Jury including the appellant, Hayes, on October 27, 1983. Scores of documents were also presented to the Grand Jury.
Because of the late hour, it was agreed that the Grand Jury would vote the following morning on October 28, 1983.
One of the prosecutors, Pat Robinson, handed what he thought to be the Hayes-Redmond indictment to the foreman of the Grand Jury, one Mary Northcutt. Each count of this indictment was explained to the Grand Jury. The Grand Jury was asked to vote on each count of the indictment and that they should return a no bill if they felt the evidence was insufficient as to any count.
Soon after the grand jurors voted, they sent word that they were ready to present the indictment in court. The prosecutors were informed that a true bill had been returned on the Hayes-Redmond indictment. This action was presented to Judge Wilters in open court at approximately 1:30 p.m. on the afternoon of October 28, 1983. After thanking the members of the Grand Jury for performing their duty, the grand jurors were directed to proceed to the circuit clerk’s office in order to be paid. At this point, Judge Wilters had not entered an order discharging the grand jurors as such.
Within two or three minutes after the members of the Grand Jury left the court room to go to the clerk's office, it was discovered that, in fact, the grand jurors had signed the “Redmond indictment” and not the “Hayes-Redmond indictment”.
Judge Wilters then directed that all grand jurors return from the clerk’s office to his court room at once. Sixteen mem *985 bers of the Grand Jury then reconvened in Judge Wilters office at approximately 1:45 p.m. on the afternoon of October 28, 1983. These 16 grand jurors then advised Judge Wilters that they, in fact, had returned a true bill on the “Hayes-Redmond indictment”. Judge Wilters was satisfied that an honest mistake had been made and that the wrong indictment had been signed by the foreman of the Grand Jury. Judge Wilters then directed that the Hayes-Redmond indictment be retyped in order to allow adequate space to be left on which to set bond as to each of the two defendants. With the members of the Grand Jury still present in the court room, Judge Wilters then asked, and Mr. Robinson asked each of them, which indictment they had voted to return. Each individual grand juror responded that they had voted to return the “Hayes-Redmond indictment”. Each was then asked if they had any objection to having the indictment corrected and to allow space for the trial judge to set bail and all replied that they had none. Each of the grand jurors then left the court room except for the foreman, Mrs. Northcutt.
Within less than five minutes after the departure of the remaining members of the Grand Jury, Judge Wilters’ secretary completed the retyping of the Hayes-Redmond indictment in order to allow space for the trial judge to set bonds as to each defendant.
Mrs. Northcutt then reaffirmed that the grand jurors had only considered the Hayes-Redmond indictment and that this was the indictment which she had been directed to sign. The Hayes-Redmond indictment then was signed and processed through the circuit clerk’s office as the indictment which had been voted upon by the members of the Grand Jury.
The original “Redmond indictment” was not voted upon and was not signed because the members of the Grand Jury indicated that this was not the indictment which they returned. This indictment was retained in the possession of Mr. Robinson.
Following the conclusion of the hearing at which the State and the defendant each presented witnesses, the trial court made findings that, in fact, a proper indictment had been returned and was in proper form and that this was the “Hayes-Redmond indictment”. This was stipulated. See Record .07 of Exhibit A, Supplemental Transcript.
In light of the stipulation which was filed and is a part of this record on appeal and the findings of the trial judge as to what actually transpired in the Grand Jury, this court finds no violation of any statute with reference to the Grand Jury proceedings in this State. See Sections 12-16-190 through 12-16-233, Code of Alabama 1975 as amended.
We have reviewed each of the statutes as hereinabove noted and find no improprieties in the presentment of this cause to the Grand Jury or in the presentation of the correct indictment to the court by the Grand Jury in this cause. No error appears.
II
The appellant challenges Rule 15, Temporary Rules of Criminal Procedure as adopted by the Supreme Court of Alabama and avers that such is unconstitutional in that it diminishes the number of strikes allowed a defendant in a joint trial. The appellant also states that requiring a one for one jury strike in a cause such as this also violates the appellant’s constitutional rights.
The Supreme Court of Alabama in Ex Parte Cofer, 440 So.2d 1121 (Ala.1983) and this court in Holsemback v. State, 443 So.2d 1371 (Ala.Crim.App.1983) have expressly rejected the arguments herein advanced by appellant.
Cofer, supra, specifically determines that the matter of the number of strikes in a criminal trial is a procedural change and does not contravene any constitutional right of the appellant.
Holsemback, supra, points out that Temporary Rule 15, A.R.C.P. now takes precedence over § 15-14-20, Code of Alabama 1975 and eliminates the right to demand a separate trial by any defendant *986 jointly indicted. This rule also covers the manner in which strikes shall be conducted in a joint trial and points out that such is a procedural matter and does not contravene any constitutional right of the appellant. Having given the appellant’s argument due consideration, we adhere to the two opinions herein mentioned and determine that no constitutional right of this appellant was infringed in this trial.
III
The appellant next challenges by appropriate motion counts 17 and 19 on which the jury found the appellant guilty and whether or not the State of Alabama proved a prima facie case of securities fraud as to these two counts.
Essentially, count 17 charges that, while acting as President of Southern Heritage Life Insurance Company, Andrew Wilson Hayes did cause a Surplus Note to be issued by the company to George Bolar, knowing that the company’s license had been revoked by the Alabama Commissioner of Insurance and that its assets had become impaired during this time so that there was no premium income coming into this company.
Similarly, count 19 charges that Andrew Wilson Hayes, as President of Southern Heritage Life Insurance Company, caused a Surplus Note to be issued to one Grace Magnor again after the assets of the company had become impaired, so that there was not sufficient premium income to pay the liabilities and that the funds paid in would be diverted to the benefit of the appellant, Andrew Wilson Hayes.
Great Southern Financial Corporation owned 100% of Southern Heritage Life Insurance Company and Founders Investment Corporation owned 50.8% of Great Southern Financial Corporation. R. 135.
The appellant, Hayes, was President of Southern Heritage Life Insurance Company as of December 31, 1979 and owned 2397 shares, or 54.6% of Class B stock in Founders Investment Corporation as of this date.
The testimony of several witnesses indicated that it was not customary for an investor to make an investment in a “Surplus Note”. Moreover, Southern Heritage Life Insurance Company’s charter was revoked on May 15, 1980. (R. 140). This meant that Southern Heritage Life could not sell insurance after this date.
The State of Alabama presented some 15 witnesses in its case in chief. We find the following to be an accurate statement of the evidence against this appellant which is taken from the State’s brief and it is herein set out as an accurate summary:
“... Mr. [Paul] Raadt, ... Chief Examiner for the Alabama Department of Insurance, testified that he did a field examination or audit of Southern Heritage Life Insurance Company for the one half year period ending on June 6, 1978. As of June 30, 1978 he found Southern Heritage to be insolvent, that its liabilities exceeded assets. (R. 121). Raadt defined a surplus note to be one that is a loan to the company which is to be paid out of the surplus of the company in an unspecified time. (R. 122). It is the sale of the surplus note which is at the core of this indictment. According to Raadt, as of June 30, 1978, Southern Heritage had $463,000.00 in surplus notes outstanding. (R. 124). The annual statement received by the Department of Insurance covering the period ending December 31, 1979 which was received by the Department on April 30, 1980, showed only two officers of Southern Heritage Life Insurance; Wilson Hayes and Edwin Howard. (R. 130). As of December 31, 1979, Southern Heritage had capital and surplus in the amount of $248,000.00; it had $540,000.00 in surplus notes, thus, the borrowed surplus was higher than its capital; (R. 131). During the year 1979, Raadt testified that there was an increase in surplus notes issued by the company in the amount of $77,000.00. (R. 132). According to Raadt, the Southern Heritage would be solvent except for the surplus notes. (R. 132). Raadt testified that the assets of the company equaled $302,000.00 and the company had $540,000.00 in outstanding surplus notes; the liabilities of the corporation of the company equaled $54,000.00. (R. 133). *987 According to Raadt, Southern Heritage would be a strong company but for the surplus notes. (R. 133). Raadt defined the term statutory deposit which is a deposit held by the State with a market value not less than $100,000.00. Raadt stated that Southern Heritage had such a deposit and that such a deposit is considered an asset of the company. (R. 133). The purpose of the statutory deposit is to protect depositors in case of financial problem incurred by the company. The statutory deposit is not reachable by the insurance company. (R. 134). According to the annual report for the period ending 12-31-79 and signed by the defendant Hayes, the structure of ownership of Southern Heritage was as follows: Founders Investment Company owned 58% of Great Southern Financial Corporation which in turn owned 100% of Southern Heritage Life Insurance. According to Raadt, the defendant Hayes owned 54.60% of the Class B stock in Founders Investment Company. The Class B stock is the voting stock of Founders. Thus, Hayes had control over Founders Investment Company. (R. 135-136). Raadt stated that Founders Investment and Great Southern Financial Corporation were not doing business as insurance companies, but that Southern Heritage Life Insurance Company was their major asset. (R. 136). Raadt stated that there was no record of how the defendant became president of Southern Heritage Life Insurance Company. (R. 137). According to Raadt, a surplus note is not an ordinary investment. It is usually an investment made by people with a financial interest in the company. According to Raadt, ordinary investors would not ordinarily have heard of surplus notes or invest in them. (R. 138). Raadt stated that Southern Heritage’s Certificate of Authority was revoked by the insurance department on May 15, 1980 which meant that Southern Heritage could no longer sell insurance in the state of Alabama. (R. 139-140). Raadt stated that a re-insurance agreement was entered into by Southern Heritage on June 1, 1979. What this meant was that all insurance policies in force issued by Southern Heritage were reinsured with another company (Old Southern Life Insurance Company). (R. 140). The effect of this re-insurance agreement was that Southern Heritage was no longer issuing insurance policies and all of the policies they had in force were rein-sured with another company. Thus, as of June 1, 1979 Southern Heritage had no premium income. (R. 141).
“The next witness was Charles Lollar who was chairman of the board and acting president of Southern Heritage Life Insurance Company until November 16, 1979. (R. 172) He stated that in June of 1979, Southern Heritage sold all its insurance that it had in force to Old Southern Life Insurance Company. (R. 173-174). Lollar testified that the defendant was a member of the board of Southern Heritage and he attended the board meetings and voted as a member of the board. (R. 176). Lollar testified that when he left Southern Heritage on November 16, 1979, the company had a surplus of between fifty and seventy thousand dollars and outstanding surplus notes of approximately $400,000.00. (R. 180).
“The next witness was Elizabeth Sandoz who knew Redmond since 1976 and the defendant Hayes since 1979. An associate of Redmond, Don Price, approached Sandoz with an offer to make an investment with Redmond during the later part of June 1976. (R. 204). The amount Sandoz was to invest was $125,000.00 and in return she was to receive an interest bearing note at 8% and an option to buy into Southern Heritage. (R. 205). The interest was to be payable the first of each month and the principal was repayable in $25,000.00 blocks beginning in late 1978 or early 1979. (R. 206). According to Sandoz, she never received those principal payments. (R. 206). She did receive interest payments from approximately July, 1976 until the end of 1978. (R. 206). According to Sandoz, Redmond retrieved the note from her. (R. 207). The note was signed by Redmond in Hayes’ office. (R. 207-210). Hayes apparently at this time was still in the private practice of law. According to Sandoz, Redmond met with her in December of 1978 and told her that she had a choice to accept a block of stock in Southern Heritage Life *988 Insurance Company or he would name her as a creditor in a bankruptcy proceeding he was involved in Illinois. (R. 219-223). Sandoz had no more dealings with Redmond for the subsequent two years and did not receive dividends or interest or anything from either the interest bearing note or stock. (R. 223). Sandoz stated that Redmond appeared one evening bearing a check for $1,000 dollars which she did not know was principal or interest. (R. 224). A block of stock was retrieved by Redmond the following day. (R. 225). Her testimony at this point is rather confusing as to whether she was to mail the stock to Redmond or Redmond pick up the stock or if she was to take the stock to Redmond. In any event, she ended up with the stock she testified unequivocably. She went home and Redmond picked up the Southern Heritage stock at her home which is located in Fairhope. (R. 232). According to Sandoz, the transaction with the stock occurred in January of 1979. (R. 233). Two years went by from the date Redmond picked up the stock before she received any payment on the principal. (R. 234-235). She received a total of $12,000.00. (R. 234-235). According to Sandoz, she talked to Hayes about the investment in 1979 in his courthouse office. (R. 235). There was no cross examination on behalf of the defendant.
“The next witness for the State was Fredrick Clarke who works for the Merchants National Bank in Mobile. He authenticated Sandoz’ cashier check dated June 9,1976 in the amount of $125,000.00. The check had Redmond’s endorsement on it in the name of Financial Counseling Incorporation. (R. 273-275). There was no cross examination on behalf of the defendant.
“The next witness called by the State was Alyce Asztalos. Alyce Asztalos’ mother is Mrs. Magnor, who ultimately purchased the Surplus Note made the basis of the indictment. The witness was introduced to Redmond by one Jim Daniels, whom she met in April of 1977. (R. 277). Daniels introduced Redmond to Alyce Asztalos at the Holiday Inn in Michigan City, Indiana; Mrs. Magnor lives in Franklin, Tennessee. (R. 278). The witness stated that Mrs. Magnor had an annuity with American Fidelity Life Insurance Company whose home offices were Pensacola. Daniels sold Magnor the annuity valued at $42,000.00. (R. 279-280). Alyce Asztalos met with Redmond and Daniels in Indiana at the end of 1979. At that time the witness was told that Redmond had a company in Alabama that would pay on the annuity; the company was an ‘old, well established insurance company in Alabama.’ (R. 285). This conversation took place at the end of November, 1979. (R. 281). Redmond told the witness that he was president of Southern Heritage Life Insurance Company and Daniels was vice-president/treasurer. (R. 285-286). At Redmond’s insistance or at least encouragement, the witness called her mother that evening and stated to her that the investment sounded good. (R. 289-290). The witness stated that both Redmond and Daniels said it would be a better investment since it would make 11% interest instead of the 9% which the annuity was now earning. (R. 291). Redmond and Daniels stated to the witness that they could stop in Franklin, Tennessee at Mrs. Magnor’s residence on the way to Alabama where they could talk with her and finish the paperwork to effectuate the transfer. (R. 292). Alyce Asztalos stated that she asked what a surplus debenture note was and that Redmond said it was when the premium income exceed claims, the excess money would be invested. (R. 293). According to Alyce Asztalos, Redmond said that the $42,000.00 was going to be invested in Southern Heritage Life Insurance Company. (R. 294). According to Alyce Asztalos, Redmond did not tell her of the $125,000.00 Sandoz note or the corporate structure of Southern Heritage nor inform her of the shareholders of Southern Heritage nor Founders Investment Company nor Great Southern Financial Corporation. (R. 295). Alyce Asztalos said she would not have recommended the investment to her mother had Redmond disclosed the above details. (R. 297). According to Alyce Asztalos, her mother did not receive her monthly interest checks. (R. 298). She does not know the defendant Hayes. (R. 298). The witness wrote a letter to the *989 insurance commissioner on or about August 19, 1982 complaining that the interest checks from the surplus note were consistently late. (R. 301). On one occasion the witness recalled calling Redmond and he asked her why she had written the letter to the insurance commissioner. (R. 302). According to the witness, Redmond stated that she should write another letter to the commissioner saying that everything had been ironed out. According to Alyce Asz-talos, Redmond threatened not to send any more interest checks to Mrs. Magnor. (R. 303-305). All of the above took place in October of 1982. (R. 305). Redmond stated that Southern Heritage Life Insurance owned land in Indiana and would give Mrs. Magnor a warranty deed for three or four pieces of land valued at $19,000.00 a piece. (R. 305). However, Mrs. Magnor never received the warranty deed and, according to the witness, never received her $42,-000.00 dollars back or any subsequent interest payments. (R. 306). According to the witness, Redmond told her that Southern Heritage Life Insurance Company was located in Spanish Fort, Alabama. (R. 322). State’s exhibits 10 and 11, interest checks from Southern Heritage to Mrs. Magnor were admitted into evidence. Said checks bear the signature of the defendant. (R. 322-325).
“The next witness for the State was Grace Magnor. She stated that she invested $42,-000.00 in Southern Heritage Life Insurance Company. (R. 327-328). She stated that Daniels and Redmond talked to her about investing in Southern Heritage; they said it would be a better investment. This conversation took place to the best of her knowledge in December, 1979. (R. 328-330). She gave Redmond and Daniels a document when they visited her in Tennessee authorizing withdrawal of her annuity with American Fidelity and investing same in Southern Heritage. (R. 329). After writing a letter to Southern Heritage making sure in fact that her $42,000.00 had been received, she received a letter from Southern Heritage saying the $42,000.00 had been received. (R. 330-331). She testified that no one explained what a surplus note was to her. (R. 331). The defendant s signature appears on the note as president of Southern Heritage Life Insurance Company. (R. 331). When Mrs. Magnor did not receive her interest payment, she called Southern Heritage. She stated that Redmond and Daniels did not tell her that Southern Heritage was not selling insurance or discuss Redmond’s note to Sandoz or his personal bankruptcy petition in Indiana. (R. 334-335). She stated that if she had known about the financial condition of Southern Heritage Life and Redmond, she would not have invested the money. (R. 337). State’s exhibit 12, a note drawn on Southern Heritage, was admitted into evidence. Said note was signed by the defendant Hayes. (R. 338-340). Mrs. Magnor testified that she never talked to Hayes about the financial condition of Southern Heritage. (R. 340). Mrs. Mag-nor testified that she did not transfer her money based solely on her daughter’s recommendation. (R. 353). Mrs. Magnor testified that Redmond and Daniels explained investment to her and thus she subsequently signed a transfer letter transferring the money to Southern Heritage. (R. 355-357). Mrs. Magnor testified that after writing the letter to Southern Heritage complaining of not receiving her interest payments, she did in fact receive them for approximately 6 to 7 months. In August of 1980, the interest payments ceased. (R. 360-361). Mrs. Magnor’s transfer letter authorizing the transfer of her money was dated December 12, 1979. (R. 364).
“The next witness for the State was L.B. Sutherland who was vice-president of American Fidelity. He authenticated a check dated December 12, 1979, State’s exhibit 13, for the amount of $42,000.00. (R. 370). There was no cross examination on behalf of the defendant.
“The next witness called was Robin Bolar whose father is George Bolar who lives in Daphne, Alabama. Robin testified that her father gave Redmond $10,000.00 in exchange for a surplus note so that he could earn a higher interest rate than was being offered by the banks at the time. (R. 378). He was present when her father gave the money to Redmond. (R. 379). Bolar testi *990 fied that her father had to borrow the money in order to get the $10,000.00. He borrowed the money at 11% and Redmond had promised a return of 11.25% on the surplus note. (R. 380). Bolar testified that the checks were turned over to Redmond at the Southern Heritage Life Insurance Company office on Highway 31 in Spanish Fort, Alabama. (R. 381). Her father received a receipt for $8,000.00 which was dated March 18, 1980. (R. 382). According to Bolar, three or four months later her father gave Redmond a personal check for the remaining $2,000.00. (R. 382). After Redmond received the $2,000.00 he brought the surplus note to Bolar’s house. Redmond, according to Bolar, said the note was a certificate. (R. 383). State’s exhibit 17, the certificate given to Mr. Bolar was introduced into evidence. (R. 383). The defendant’s signature as president of Southern Heritage Life Insurance Company appears on the certificate. (R. 384). Redmond told Bolar that he would receive 16% interest although only 10% interest appears on the note. (R. 384). According to Mr. Bolar, her father did not receive any money on the certificate until February of 1983. (R. 386). In February, 1983, her father received a cashier’s check for $6,000.00 and warranty deed from Redmond. (R. 386). The defendant’s signature appears on the warranty deed. (R. 387-388). Redmond stated to Mr. Bolar that he would buy back the land to repay the money. According to Mr. Bolar, his father ultimately was paid $10,000.00 plus $40.00 in interest. (R. 387-388). There was no cross examination.
“The next witness was Mr. George Bolar. Mr. Bolar recounted essentially the same facts as his son. (R. 405-406). Since he is blind, his daughter had to read the note to him and the note carried the name of Southern Heritage Life Insurance Company. (R. 407). According to Mr. Bolar, Redmond did not tell him about the financial condition of Southern Heritage or about any bankruptcy petition or the Sandoz note. (R. 408-409). Furthermore, Redmond did not tell Bolar that Southern Heritage’s Certificate of Authority had been revoked. (R. 410). The date on the Bolar note is June 30, 1980 which is after the Certificate of Authority had been revoked on May 15, 1980. (R. 410). Redmond stated to Bolar that he, Bolar, would get his money back, when he, Redmond, was ready. Mr. Bolar testified that he tried to get his money back many, many times from Redmond. (R. 412). The above conversations with Redmond took place in Baldwin County. (R. 413). According to Mr. Bolar, Redmond asked him not to testify. (R. 415).
“The next witness called by the State was Craig Helms of the Southern Trust Bank of Baldwin County which formally was called Baldwin County Bank. The check payable to Mrs. Magnor was negotiated at his bank. It was endorsed by Hayes as president of Southern Heritage Life Insurance Company. (R. 429). State’s exhibit 19, a certificate of deposit, was purchased by Southern Heritage Life Insurance in the amount of $42,000.00 on December 26, 1979. (R. 430). At this point several checks were used to purchase other instruments. State’s exhibit 13 was used to purchase State’s exhibit 19. The amount on State’s exhibit 13 was $42,247.50. The amount on State’s exhibit 19 was $42,000.00. The difference was paid to Southern Heritage Life Insurance Company. (R. 431). State’s exhibit 21, a signature card for Southern Heritage checking account was introduced. The authorized signatures were defendant Hayes, Howard, and one Ms. Yiggues who is Redmond’s secretary. (R. 432). The signature card for Founders Investment Corporations’ checking account contained the same three names. Both account signature cards were signed on January 7, 1980. (R. 433). State’s exhibit 19, the CD was cashed. One cashier’s check for $25,000.00 was issued to Founders Investment; one cashier’s check in the amount of $17,000.00 was issued to Southern Heritage. (R. 436). The check issued to Southern Heritage was dated for January 1, 1980. (R. 436). Southern Heritage’s bank statement for January, 1980 shows a deposit made on January 14, 1980 for $17,000.00; it also shows on January 17, 1980 a withdrawal in the amount of $16,000.00. (R. 437). State’s exhibit 24, a check drawn on Southern Heritage’s account, was issued to de *991 fendant Hayes in the amount of $16,000.00. Said check was endorsed by the defendant. (R. 437-438). State’s exhibit 26, a copy of a cashier’s check in the amount of $25,-000.00 payable to Founders Investment Corporation and dated January 14, 1980 was purchased by Southern Heritage. (R. 440). State’s exhibit 17, a deposit slip on the account of Founders Investment Corporation contained an entry for the amount of $25,000.00 made on January 14, 1980. The bank statement for that month showed one check drawn on that account in January for an amount of $25,000.00. (R. 441). The State’s exhibit 33, a check drawn on January 14, 1981 on Founders Investment account was made payable to Financial Counselors Incorporated, d/b/a Midwest Enterprises in the amount of $25,000.00 is endorsed by Redmond. (R. 442). The defendant Hayes and Ms. Viggue signed the above check on behalf of Founders. (R. 442). State’s exhibit 34, a cashier’s check dated January 14, 1980 issued by the Baldwin County Bank, payable to Financial Counselors d/b/a Midwest Enterprises, was purchased by Founders Investors Corporation. The check was negotiated by Financial Counselors as endorsed by Redmond. (R. 443). State’s exhibit 15, a cashier’s check in the amount of $2,000.00 purchased by Bolar, made payable to Southern Heritage was issued on July 1, 1980. (R. 444). State’s exhibit 14, a deposit slip on the account of Southern Heritage lists three items with a total deposit of $8,000.00. (R. 446). All three items were payable to Mr. Bolar, who endorsed the items over to Southern Heritage. (R. 446). The above deposit was made on March 19, 1980. (R. 447). No cross examination was offered on behalf of the defendant.
“The next witness was Lucretia Rosser who is an employee and custodian of records for Citizens Trust Bank in Atlanta. She authenticated State’s exhibit 35, the signature card for an account in the name of LeCap Hospitality Management d/b/a Midwest Enterprises. (R. 457). Redmond is one of the signatories on that card. (R. 457). State’s exhibit 35, a cashier’s check drawn on Baldwin County Bank was deposited in the above account from Financial Counseling d/b/a Midwest Enterprises. (R. 458).
“The next witness Gwen Franklin of the First National Bank of Mobile. State’s exhibit 36 was authenticated by her which is an off cash ticket and cashier’s check purchased by Hayes and payable to Hayes used to purchase a wire transfer and $1,000.00 back in cash. (R. 461-462). State’s exhibit 37 was an entry for $15,-000.00 and a $3.00 fee for the wire transfer. State’s exhibit 38 was a cash ticket for the amount of $15,000.00; State’s exhibit 39 was a copy of the wire transfer the bank made to the Federal Reserve Bank of Atlanta. The transfer was sent from Juan Gutierreze to Lupe Rodrigues. (R. 462). State’s exhibit 40 was a deposit slip used to open a new account with an initial deposit of $2,000.00. The deposit was a check which was payable to Southern Heritage from George Bolar. (R. 462-463).
“The next witness was Ronnie McClure who works for a C.P.A. firm from Gadsden. McClure audited Southern Heritage’s books ending December 31, 1979. (R. 465). During February of 1980, McClure had a meeting with Hayes and one Ferris, a partner in the C.P.A. firm, to discuss the financial transactions of Southern Heritage for the period ending December 31, 1979. (R. 466). As a result of the meeting, McClure made a journal entry to record the $42,-000.00 CD and surplus note to Magnor for $42,000.00. Another entry was made for the purchase of a condominium for $35,-000.00. and the issuance of a surplus note to Financial Counseling Corporation for $35,000.00 and the sale of the $35,000.00 condo to James Daniels. (R. 467-468).
“The next witness called by the State was Ruth Viggue who worked for Hayes for approximately sixteen to seventeen years as his secretary. She testified that Southern Heritage had an office in Spanish Fort, Alabama. (R. 472). Daniels was an office manager for another insurance company. (R. 473). Mrs. Viggue was not aware of any business being conducted by Southern Heritage. (R. 474-475). She was authorized to sign checks on the Southern Heritage checking account. She was familiar *992 with Hayes’ signature. She testified that the instrument to Bolar, signed by Hayes, was a surplus note. (R. 477). She further identified defendant Hayes’ signature on the cashier’s check, State’s exhibit 36. (R. 478).
“The next witness called was Mr. Raadt again. He stated that an appeal was filed from the revocation of authority and the appeal was signed by the defendant, Hayes. (R. 498-502). The denial of the appeal was entered on June 23, 1980 and said denial was sent to the company in Spanish Fort. (R. 503). Raadt stated that Southern Heritage probably did not have enough money or any surplus to pay the surplus notes and after the revocation and could not legally issue surplus notes. (R. 503-507). Raadt stated that an appeal to the Court of Civil Appeals was dismissed on July 24, 1981. Raadt stated that Hayes acquired Southern Heritage sometime in 1978.
“James Hartley, an investigator with the Securities Department, was the next witness for the State. His testimony adds nothing that the other witnesses have not already testified to and therefore his testimony will not be detailed.
“After Hartley’s testimony, the State rested its case.”
The evidence clearly establishes that the appellant, Hayes, was the owner of Southern Heritage Life during 1978. By the end of 1979, the company was impaired and had reinsured all of its outstanding policies with another company. This left the company with no income from premiums.
At the end of 1979 Mrs. Magnor was induced to invest in Southern Heritage Life. She did not know what a “Surplus Note” was and indicated that she would not have invested in Southern Heritage had she known its financial condition. It is an accurate statement to indicate that Mrs. Mag-nor felt that she was buying another annuity in a different company. Knowing the financial condition of Southern Heritage Life, nevertheless, this appellant, as President, issued the Surplus Note to Mrs. Mag-nor. At this point in time the company’s position was impaired, as it had sold its insurance policies and had no premium income. Mrs. Magnor did receive some principal and interest at a later date, but she did not receive all of her money. The funds she paid in were divided between the appellant, the original co-defendant, Redmond, and a Mr. Daniels, who is now deceased.
The Bolar Surplus Note was issued on June 30, 1980, approximately six weeks after the Certificate of Authority had been revoked by the State Department of Insurance. It is true that the company appealed this revocation. The appellant, Hayes, signature appears on the “Surplus Note”. This appellant, knowing the financial condition of Southern Heritage Life, nevertheless, allowed the note to be issued. Bolar did receive some $10,000.00 and, later, some interest payments.
The headquarters of Southern Heritage Life was in Baldwin County, Alabama and the Surplus Notes were mailed from Baldwin County. Most of the financial transactions of this company took place in Baldwin County. The appellant’s place of residence was Baldwin County, Alabama, as was the company. There is no question but that venue was properly established in this cause.
As to what the State must prove by way of specific intent in a securities case, or as to guilty knowledge on the part of appellant, we find that the following statement by Mr. Chief Justice Torbert, speaking for the Supreme Court of Alabama, in Buffo v. State, 415 So.2d 1158 at 1165 (Ala.1982) covers the evidence in this cause and as to the measure of proof that must be presented most accurately:
“As to whether the State must prove specific intent in a securities case, reference to the Comments and Commissioners’ Notes to the Uniform Securities Act, after which the Securities Act of Alabama is modeled, are instructive. The comments to § 409(a), which is similar to Code 1975, § 8-6-17, refer the reader to the comments under § 204(a)(2)(B) and provide:
*993 ‘As the federal courts and the SEC have construed the term “willfully” ... all that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing. Proof of evil motive or intent to violate the law, or knowledge that the law was being violated, is not required.’
“1 Blue Sky L.Rep. (CCH) ¶ 5524 at 1513 (1980). As required by the statute, Buf-fo was charged with willfully engaging in fraudulent conduct in connection with the offer, sale or purchase of a security. “While Alabama cases have held that there must be a guilty knowledge or mens rea, Favor v. State, 389 So.2d 556, 562 (Ala.Cr.App.1980); Van Antwerp v. State, 358 So.2d 782 (Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala.1978); Manson v. State, 349 So.2d 67 (Ala.Cr.App.), cert. denied, 349 So.2d 86 (Ala.1977); federal cases have held this to mean: ‘We think that the government is required to prove specific intent only as it relates to the action constituting the fraudulent, misleading or deceitful conduct, but not as to the knowledge that the instrument used is a security under the Securities Act. The government need only prove that the object sold or offered is, in fact, a security; it need not be proved that the defendant had specific knowledge that the object sold or offered was a security.
‘...
‘... [W]here inclusion of the instrument in question in the definition of a security in the context of a fraud case is itself a jural fact, the knowledge and belief of the defendant with respect to this is not a relevant fact requiring proof.’
“United States v. Brown, 578 F.2d 1280, 1284 (9th Cir.1978). A party can willfully violate a securities law without knowing of its existence. United States v. Peltz, 433 F.2d 48 (2d Cir.1970). It is reasonable to assume that one who connects himself so closely with such a transaction has an interest in that transaction and it places upon him the duty to stay informed as to the consequences of such a transaction. Van Riper v. United States, 13 F.2d 961, 966 (2d Cir.1926). Thus, intent to deceive means ‘intent to say something, that is expected to be relied on, that is not believed to be true, or, if strictly true, is hoped will be understood in an untruthful sense.’ SEC v. World Radio Mission, Inc., 544 F.2d 535, 540 (1st Cir.1976). Knowledge that the act is in violation of the securities laws, or that the instrument in question is a security, is not a relevant fact requiring proof. See, United States v. Riedel, 126 F.2d 81 (7th Cir.1942).”
Since a Surplus Note can only be paid from surplus from the company, and since there was no real expectation of Southern Heritage Life having a surplus or being able to generate income, having sold its insurance policies, the entire transaction in this cause was a sham. Buffo, supra.
The State of Alabama clearly presents a prima facie case and the trial court correctly allowed the cause to go to the jury on counts 17 and 19 of the indictment in question.
IV
The appellant argues that reversible error occurred by allowing the State, after it had rested, to cross-examine a co-defendant, Mr. Redmond, who had elected to testify, particularly with reference to the involvement of appellant Hayes, in the alleged scheme to defraud. See record pages 834-851.
An analysis of this part of the record clearly shows that the State did not reopen its case as alleged by the appellant. There are only two or three slight references to the appellant, Hayes, throughout this part of the record. The trial judge instructed the jury that they should only consider that evidence with reference to Hayes which was material to him and that the other evidence should be considered with reference to the co-defendant, Redmond. The trial judge carefully admonished the jury with reference to these matters. No error thus appears.
*994 V
Another issue argued by appellant involves certain evidence with reference to statements from Redmond and a witness which did not involve appellant. The trial court was very careful to instruct the jury that this evidence was related only to the co-defendant, Redmond, and was not to be considered as evidence against the appellant, Hayes. See record page 414. Due to the trial court’s instruction, no error occurred. Rule 45, A.R.A.P.
Moreover, because of Redmond’s actions as set forth under Issue III in this opinion, the State was trying this cause under the allegation of a general conspiracy. We are of the opinion that such evidence was also admissible to establish the actions of the principals in this cause, Daniels, Redmond and Hayes. See Conley v. State, 354 So.2d 1172 (Ala.Crim.App.1977); Williams v. State, 383 So.2d 547 (Ala.Crim. App.1979), affirmed, 383 So.2d 564 (Ala. 1980) and Lewis v. State, 414 So.2d 135 (Ala.Crim.App.1982), cert. denied, 414 So.2d 140 (Ala.1982). Thus, the admission of the evidence hereinabove noted was proper in this cause.
VI
The appellant next asserts that the admission of his statement into evidence without proper proof of the corpus delicti was error (R. 549) and, moreover, that there was no proof of proper warnings under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
After the appellant raised the objection at trial that the State failed to prove the corpus delicti in this cause (R. 548-559), the State decided not to use the statement of appellant, Hayes. (R. 562). Therefore, Hartley’s subsequent testimony made no mention of the appellant, Hayes. Moreover, no Miranda warnings were required because the appellant, Hayes, was not in custody at this time and, too, the corpus delicti had already been proven. The State correctly points these matters out in its brief.
VII
The appellant argues next with reference to some five items which were admitted into evidence at various points during the trial of this cause. (A) An argument with reference to the witness’ examination of the records of Southern Heritage Life Insurance Company from January 1, 1977 through June 30, 1978. Because of the appellant’s connection with Southern Heritage Life, that is, taking over as President of this corporation, there can be no doubt but that the records with reference to the financial condition just prior to the transactions, which were the basis of this indictment, were a proper inquiry. Such knowledge would be imputed to this appellant since he became President of Southern Heritage Life and was such during the time of the issuance of the two “Surplus Notes”. The trial court’s ruling in this respect was proper.
Next, the appellant objected to the introduction into evidence of Exhibits 3 and 4 in paragraph B. This objection appears on Record 190. There is not a sufficient adverse ruling in this instance to preserve this issue for review. See Trawick v. State, 431 So.2d 574 (Ala.Crim.App.1983) and Ragsdale v. State, 448 So.2d 442 (Ala.Crim.App.1984).
Similarly, we do not consider the appellant’s objection on Record 371 as to the evidence of capital and surplus status of American Fidelity Life Insurance Company as of December 31, 1979 to be well taken for the reasons herein stated. The same is also true as to how long American Fidelity Life Insurance Company had been in existence. (R. 373).
Finally, the appellant objects to the introduction of evidence with reference to a meeting between the codefendant, Redmond, and Mrs. Sandoz in 1978. (R. 219). It should be noted that the trial court on Record 222, at the request of the appellant, instructed the jury that this testimony should be considered only with reference to the co-defendant, Redmond, and not the appellant, Hayes. Under these instructions, no error appears.
*995 This court has carefully examined this record in light of all issues asserted on appeal. We find this record free of error. For the reasons stated, the judgment which was appealed from is due to be and is, hereby, affirmed.
AFFIRMED.
All the Judges concur.